**STATE of Minnesota, Respondent,**

v.

**Todd Jeffrey ASKEROOTH, Appellant.**

No. C6–02–318.

Supreme Court of Minnesota.

June 17, 2004.

Office of MN State Public Defender, Jodie L. Carlson, Assistant State Public Defender, Minneapolis, MN, for Appellant.

Mike Hatch, Minnesota Attorney General, Susan Gaertner, Ramsey County Attorney, Mark Nathan Lystig, Assistant Ramsey County Attorney, St. Paul, MN, for Respondent.

## OPINION

PAUL H. ANDERSON, Justice.

Shortly after midnight on April 21, 2001, a Saint Paul police officer stopped Todd Jeffrey Askerooth for failing to obey a

stop sign. After making the stop, the officer learned that Askerooth did not have a driver's license. The officer asked Askerooth to get out of his van, conducted a pat-down search for weapons, and then confined Askerooth in the back seat of the officer's squad car. After identifying Askerooth, the officer asked for and received consent to search the van. He searched the van with the assistance of two other officers who arrived at the scene. Following the search, the officer issued citations for the driving offenses, after which he permitted Askerooth to leave on foot. The officer then searched his squad car and discovered a film canister containing methamphetamine.

Askerooth was charged with fifth-degree possession of a controlled substance. He moved to suppress the methamphetamine on the ground that it was discovered as the result of an unreasonable seizure. The Ramsey County District Court denied this motion, finding that the placement of Askerooth in the back of the squad car was temporary and done so the officer could investigate Askerooth's identity. The court then convicted Askerooth in a bench trial. Askerooth appealed and the court of appeals affirmed. We reverse.

At approximately 12:40 a.m. on April 21, 2001, Saint Paul police officer Thaddus Schmidt was traveling south on Farrington Avenue in Saint Paul's North End neighborhood. As Schmidt stopped at the stop sign at the intersection with Stinson Street, he saw a van traveling west on Burgess Street a block to the south. The van went through the intersection at or below the posted speed limit, but did not stop for a stop sign. The van's failure to stop prompted Schmidt to pursue it. Schmidt turned onto Burgess, followed the van, and caught up with it at the next intersection where the van turned south. Schmidt then activated his emergency lights. Shortly thereafter, the van pulled over to the curb and stopped.

Schmidt parked behind the van and left his headlights on. He observed that the driver appeared to be the van's sole occupant. He then approached the van and asked the driver for his driver's license. When the driver said he did not have a license, Schmidt ordered him to step out of the van, which he did. Schmidt then had the driver put his hands behind his head while Schmidt did a pat-down search for weapons. Schmidt then ordered the driver to walk to the squad car where he confined him in the back seat. It is undisputed that the driver was not free to leave the scene without Schmidt's permission and, once in the squad car, he could not open either door. A few minutes after Schmidt confined the driver in the back seat, two other Saint Paul police officers arrived at the scene, but remained outside Schmidt's squad car.

While the driver was in the back seat, Schmidt asked him if he had any identification. The driver again said he did not have a driver's license, but he identified himself as the appellant, "Todd Askerooth," and provided his date of birth and address. Schmidt entered this information into his computer and received a matching physical description. The computer search also showed that Askerooth's driver's license had been revoked.

Schmidt then asked Askerooth if he knew why he was stopped. Askerooth said he did not. Schmidt explained it was for failure to obey the stop sign at Burgess and Farrington. Schmidt informed Askerooth he would be issuing citations for failing to obey a stop sign and for driving after revocation, but Schmidt did not immediately issue the citations. At some point while Askerooth was still in the back seat, Schmidt asked him for consent to search the van. Askerooth orally consent-

ed to the search. Schmidt then searched the van with the assistance of the other two officers. While the search was conducted, Askerooth remained confined in the back seat of the squad car. The only reported item discovered as a result of the search was a small scale, found in a basket on the front passenger seat.

After the search, Schmidt issued citations to Askerooth for failing to obey a stop sign and for driving after revocation. Because Askerooth did not have photo identification, Schmidt had him place a fingerprint of his right index finger on the citation form. Schmidt advised Askerooth to lock the van, leave it where it was legally parked, and walk to his home which was approximately three blocks away. Askerooth then locked the van and Schmidt allowed him to leave. Once Schmidt released Askerooth, he immediately searched the squad car's back seat. During this search, Schmidt found a black film canister "tucked" under the back seat on the passenger side of the squad car. Opening the canister, he found two small bags containing what appeared to him to be methamphetamine or a "drug of that sort."

It is not clear what happened next, but the record reflects that later that same day Askerooth was in custody at the Ramsey County Adult Detention Center where he was interviewed by the police. During this interview, Askerooth admitted that he placed the canister in the back seat and he did it because he was scared. The record is silent as to when Askerooth placed the canister in the back seat. Askerooth also admitted that the substance in the canister was methamphetamine and that he uses the drug. A subsequent test confirmed that the substance was methamphetamine

with a gross weight of 2.5 grams. Based on this information, the county attorney charged Askerooth with fifth-degree possession of a controlled substance in violation of Minn.Stat. § 152.025, subd. 2(1) (2002).

Askerooth moved to suppress the methamphetamine on the ground that it was discovered as a result of an unreasonable seizure. Schmidt testified at an omnibus hearing on the motion that, while he was following the van, he did not observe any traffic violations other than the initial failure to obey the stop sign. He acknowledged that he did not run a license plate check when following the van. He also testified that Askerooth was cooperative and did not do anything to arouse his suspicion or lead him to believe that Askerooth was dangerous. In addition, Schmidt testified that he did not recognize Askerooth from any prior incidents. Schmidt acknowledged that it is his standard procedure to put individuals driving without a license in the back seat of his squad car in order to facilitate obtaining information about their identity without having to go back and forth between the vehicles.[1]

With regard to the van search, Schmidt testified that he did not have Askerooth sign a written consent form nor did he tell Askerooth that he was free to withhold consent. The sole reason Schmidt gave for why he asked to search the van was to ensure that Askerooth did not have access to any weapons when he returned to it. Schmidt further testified that he searches the back seat of his squad car each day when his shift begins and each time he removes anyone from the back seat.

---

1. It is not clear from the record if this is also standard procedure for the Saint Paul Police Department.

The district court denied Askerooth's motion to suppress the methamphetamine. The court found that the placement of Askerooth in the back seat was temporary so Schmidt could investigate Askerooth's identity. In a bench trial following the omnibus hearing, the court found Askerooth guilty of fifth-degree possession of a controlled substance. Minn.Stat. § 152.025, subd. 2(1). The court sentenced Askerooth to one year and one day in prison, stayed the sentence, and placed him on probation for five years.

Askerooth appealed the denial of his suppression motion and the court of appeals affirmed. *State v. Askerooth*, No. C6–02–318, 2003 WL 230673, at *2 (Minn. App. Feb.4, 2003). The court of appeals held that placing Askerooth in the back seat was reasonable because the stop occurred at 12:40 a.m., the officer was alone, and it was a practical way for the officer to accomplish the lawful task of verifying Askerooth's identity, the status of his license, and to issue the citations. *Id.* at *2.

## I.

■ We are asked to determine whether Schmidt's confinement of Askerooth in the back seat of his squad car was an unreasonable seizure warranting suppression of the methamphetamine. Both the Fourth Amendment to the United States Constitution and Article I, Section 10 of the Minnesota Constitution guarantee the "right of the people to be secure in their persons, houses, papers, and effects" against "unreasonable searches and seizures." U.S. Const. amend. IV; Minn. Const. art. I, § 10. When reviewing a pretrial order on a motion to suppress evidence, we may independently review the facts and determine whether, as a matter of law, the district court erred in suppressing or not suppressing the evidence. *State v. Harris*, 590 N.W.2d 90, 98 (Minn. 1999).

It is undisputed that Askerooth was seized; therefore, our focus is on whether his seizure was reasonable. When determining the reasonableness of a seizure during a traffic stop, courts have been guided by the United States Supreme Court's statement that a traffic stop is more analogous to an investigative stop, as discussed in *Terry v. Ohio*,[2] than to a formal arrest. *Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (citing *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). While *Berkemer* is perhaps the most explicit statement connecting *Terry* principles to police stops for minor traffic violations, the connection has been implicitly stated elsewhere. *See, e.g., Pennsylvania v. Mimms*, 434 U.S. 106, 108–12, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (applying *Terry* principles to a traffic stop supported by

---

2. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In *Terry*, the Supreme Court evaluated a police officer's investigative detention and pat-down search of three men suspected of "casing" a store in order to commit an armed robbery—one of whom was John Terry. *Id.* at 5–7, 88 S.Ct. 1868. The Court developed and applied an analytical framework for applying the Fourth Amendment's prohibition of "unreasonable searches and seizures." *Id.* at 20–30, 88 S.Ct. 1868. In assessing the reasonableness of the officer's seizure and search of Terry, the Court focused on the balance between an officer's interest in safety and a suspect's interest in being free from the invasiveness of a search. *Id.* at 23–24, 88 S.Ct. 1868. The Court concluded that at the time the officer seized and searched Terry, the officer had reasonable grounds to believe Terry was armed and dangerous and that it was necessary for the protection of himself and others to swiftly seize and conduct an appropriately restricted search of Terry to discover if he was armed and neutralize any threat. *Id.* at 29–30, 88 S.Ct. 1868. The relevant principles from *Terry* are more fully described in Section II, *infra*.

probable cause). Thus, a general rule has emerged that a Fourth Amendment challenge to the reasonableness of a traffic stop is analyzed under *Terry* principles. *United States v. Jones*, 269 F.3d 919, 924 (8th Cir.2001); *People v. Gonzalez*, 204 Ill.2d 220, 273 Ill.Dec. 360, 789 N.E.2d 260, 265 (2003); *see also State v. Wiegand*, 645 N.W.2d 125, 133 (Minn.2002) (concluding that *"Terry* principles are appropriately applied * * * when a motor vehicle is stopped for a routine equipment violation.").[3]

While courts have been guided by the Supreme Court's analogy to a *Terry* stop in *Berkemer*, this analogy was qualified by the Court in a footnote explaining that

[n]o more is implied by this analogy than that most traffic stops resemble, in duration and atmosphere, the kind of brief detention authorized in *Terry*. We of course do not suggest that a traffic stop supported by probable cause may not exceed the bounds set by the Fourth Amendment on the scope of a *Terry* stop.

468 U.S. at 439 n. 29, 104 S.Ct. 3138. Despite this qualification, a number of courts have applied *Terry* principles to traffic stops even when those stops were supported by probable cause. For example, both the Illinois Supreme Court and the Tenth Circuit Court of Appeals have explicitly held that the *Terry* analysis applies *irrespective* of whether a stop for a minor traffic offense is based on reasonable suspicion or supported by probable cause. *Gonzalez*, 273 Ill.Dec. 360, 789 N.E.2d at 266; *United States v. Holt*, 264 F.3d 1215, 1230 (10th Cir.2001) (en banc); *cf. State v. Munson*, 594 N.W.2d 128,

135–36 (Minn.1999) (stating that "even if a search is supported by probable cause, the scope of the search and any detention of the suspect must still be reasonable.").

Whether *Terry* can still be applied to traffic stops supported by probable cause is uncertain in light of the United States Supreme Court's 5–4 decision in *Atwater v. City of Lago Vista*, 532 U.S. 318, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001). In *Atwater*, a woman arrested for a seatbelt violation in Texas filed a civil suit alleging her arrest violated her Fourth Amendment right to be free from unreasonable seizure. *Id.* at 325, 121 S.Ct. 1536. The seatbelt violation was a misdemeanor punishable by a fine from $25 to $50. *Id.* at 323, 121 S.Ct. 1536. The Court reviewed legal history from before and after the framing of the Fourth Amendment to determine whether the amendment incorporated a prohibition on arrests not amounting to a breach of the peace. *Id.* at 326–45, 121 S.Ct. 1536. Because this historical analysis yielded no clear answer, the Court concluded that the Fourth Amendment does not prohibit the warrantless arrest of a person who has committed a misdemeanor not amounting to or involving a breach of the peace. *Id.* at 340, 345, 121 S.Ct. 1536. The Court held that the existence of probable cause applies to all arrests and makes it unnecessary for a court to balance individual and governmental interests. *Id.* at 354, 121 S.Ct. 1536. Specifically, "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Id.*[4]

---

**3.** The most pertinent *Terry* principles for our discussion are the emphasis on the need for reasonableness to justify each new or increased intrusion during an investigative detention and the consideration of the balance of individual and governmental interests in evaluating reasonableness.

**4.** In dissent, Justice Sandra Day O'Connor, joined by Justices Stevens, Ginsburg, and Breyer, criticized the majority for adopting a

Even though both the Illinois Supreme Court and the Tenth Circuit—subsequent, but without reference, to *Atwater*—held *Terry* to apply to traffic stops supported by probable cause, the implications of *Atwater*'s holding cannot be overlooked. *Atwater* removes Fourth Amendment reasonableness limitations from even a "very minor" traffic stop when the stop is supported by probable cause. 532 U.S. at 354, 121 S.Ct. 1536. As a result, we are uncertain that *Terry* principles still apply to a court's determination whether a seizure during such a traffic stop can be unreasonable under the Fourth Amendment. *See United States v. Childs,* 277 F.3d 947, 953 (7th Cir.2002) (en banc), *cert. denied,* 537 U.S. 829, 123 S.Ct. 126, 154 L.Ed.2d 43 (2002) (discussing *Atwater;* stating that "although traffic stops usually proceed like *Terry* stops, the Constitution does not require this equation. Probable cause makes all the difference."). It is undisputed that Schmidt's personal observation of Askerooth's failure to obey the stop sign likely provided Schmidt with probable cause that Askerooth had committed an offense. If the Fourth Amendment no longer applies to such a situation, the district court did not err in finding that the Fourth Amendment did not require the exclusion of the methamphetamine because of the seizure.

■ But Askerooth asserts that his seizure was unreasonable not only under the Fourth Amendment, but *also* under Article I, Section 10 of the Minnesota Constitution. The language of article I, section 10 parallels the language of the Fourth Amendment. Decisions of the United States Supreme Court interpreting the Fourth Amendment are of "persuasive, although not compelling, authority" in interpreting article I, section 10. *In re B.R.K.,* 658 N.W.2d 565, 577 (Minn.2003); *accord Harris,* 590 N.W.2d at 97. Therefore, simply because *Atwater* has most likely foreclosed any Fourth Amendment protection for Askerooth, this does not mean that article I, section 10 does not afford him protection.

■ It is axiomatic that we are free to interpret the Minnesota Constitution as affording greater protection against unreasonable searches and seizures than the United States Constitution. *State v. Fuller,* 374 N.W.2d 722, 726 (Minn.1985) (citing *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 81, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980)). Here, we note that since *Atwater,* the highest courts of two other states have, in the context of minor criminal offenses, interpreted their constitutions as embodying reasonableness protections independent of and greater than Fourth Amendment protections. *State v.*

bright-line rule instead of balancing individual and governmental interests and thus departing from the Court's earlier declaration that when history is inconclusive, the Court "will 'evaluate the search or seizure under traditional standards of reasonableness by assessing, on the one hand, the degree to which [the search or seizure] intrudes upon an individual's privacy and, on the other, the degree to which [the search or seizure] is needed for the promotion of legitimate governmental interests.' " *Atwater,* 532 U.S. at 361, 121 S.Ct. 1536 (5–4 decision) (O'Connor, J., dissenting) (quoting *Wyoming v. Houghton,* 526 U.S. 295, 300, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999)).

The majority's holding, O'Connor continued, not only was unsupported by precedent, but also was contrary to core Fourth Amendment principles and in "serious tension" with a prohibition on unreasonable seizures. *Id.* at 362–64, 121 S.Ct. 1536.

Various commentators have criticized the soundness and the implications of *Atwater*'s holding as well as its possible incongruity with Fourth Amendment precedent. *E.g.,* 3 Wayne R. LaFave, *Search and Seizure* § 5.1 at 25–41 (2004 Supp.); Wayne A. Logan, *Street Legal: The Court Affords Police Constitutional Carte Blanche,* 77 Ind. L.J. 419 (2002).

*Brown,* 99 Ohio St.3d 323, 792 N.E.2d 175, 178 (2003); *State v. Bauer,* 307 Mont. 105, 36 P.3d 892, 897 (2001). It is our responsibility as Minnesota's highest court to independently safeguard for the people of Minnesota the protections embodied in our constitution. *State v. Carter,* 596 N.W.2d 654, 657 (Minn.1999); *O'Connor v. Johnson,* 287 N.W.2d 400, 405 (Minn.1979). But, in independently safeguarding these protections "we will [not] cavalierly construe our constitution more expansively than the United States Supreme Court has construed the federal constitution." *Fuller,* 374 N.W.2d at 726–27; *accord Harris,* 590 N.W.2d. at 98.

We begin our analysis of whether to look to our constitution by noting that in two recent cases, we have concluded that there was a principled basis for interpreting article I, section 10 of our constitution as providing greater protection than the Fourth Amendment. *In re E.D.J.,* 502 N.W.2d 779, 783 (Minn.1993); *Ascher v. Comm'r of Pub. Safety,* 519 N.W.2d 183, 187 (Minn.1994). In *California v. Hodari D.,* 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), the Supreme Court held that a seizure occurs and Fourth Amendment reasonableness protections are triggered only when the police use physical force or a person submits to a show of authority by the police. In *E.D.J.,* we declined to follow this holding because it was a sharp departure from our tradition and practice. 502 N.W.2d at 783. Rather, we continued to adhere to our longstanding rule that a seizure occurs when a reasonable person in the defendant's shoes would not feel free to leave,

thereby maintaining the reasonableness requirement in a wider range of circumstances. *Id.*

In *Ascher,* for similar reasons, we declined to follow the Supreme Court's holding in *Michigan Dep't of State Police v. Sitz,* 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990). In *Sitz,* the Supreme Court held that a police roadblock where all drivers were stopped in order to investigate for drunk driving did not violate the Fourth Amendment. *Id.* at 455, 110 S.Ct. 2481. The Court determined that the state interest in preventing drunk driving outweighed the intrusion of the stop upon individual motorists. *Id.* We concluded in *Ascher* that *Sitz* was a radical departure from how a *Terry*-style balancing test had previously been applied and how the state and individual interests should have been weighed in the context of such roadblocks. 519 N.W.2d at 186. Consequently, we held that article I, section 10 required police to have an "objective individualized articulable suspicion of criminal wrongdoing *before* subjecting a driver to an investigative stop." *Id.* at 187.

*Atwater's* sharp departure from our traditional understanding of the protections from unreasonable seizure provides a similar principled basis [5] for us to look to our own constitution. *See id.* at 186. Specifically, *Atwater's* apparent removal of any consideration of a balancing of individual interests with governmental interests troubles us because this removal is in tension with a broad range of our precedent applying the Fourth Amendment. *See, e.g., State v. Richardson,* 622 N.W.2d 823, 826

---

5. The use of the term "principled basis" by the special concurrence mischaracterizes the use and significance of that term as we use it here and as we have used it before. *See, e.g., Harris,* 590 N.W.2d at 97–98 (recognizing that "many principled bases have been articulated for state courts to construe their state consti-

tutions as more protective than their federal counterparts, including: * * * relatedness of the subject matter to the state, * * * and a determination that a more expansive reading of the state constitution represents the better rule of law.").

(Minn.2001) (applying *Terry* principles to traffic stop when erratic driving indicated violation of "any number of Minnesota statutes"). It is also difficult to reconcile *Atwater* with our interpretation of article I, section 10 relating to traffic stops. For example, we have interpreted article I, section 10 as providing distinct protection from the expansion of traffic stops to include intrusive police questioning when there was no reasonable articulable suspicion to justify the questioning. *State v. Fort*, 660 N.W.2d 415, 419 (Minn.2003). Finally, and of significant importance to the result we reach today, the Supreme Court's holding in *Atwater* may affect vast numbers of our residents in their interactions with the police on a daily basis. *See State v. George*, 557 N.W.2d 575, 579 (Minn.1997) (noting that "very few drivers can traverse any appreciable distance without violating some traffic regulation" (citations omitted)); Roy Moreland, *Some Trends in the Law of Arrest*, 39 Minn. L.Rev. 479, 489 (1955) (observing that "it

is in traffic situations that most contacts of the public with the police occur"); *see also* footnote 4 *supra.*

■ We conclude that, in the context of traffic stops, following *Atwater*'s proposition that the existence of probable cause of a minor traffic violation eliminates the need for balancing individual and governmental interests would threaten the integrity and coherence of our interpretation of article I, section 10 in *Fort*. Moreover, we cannot ignore our conclusion in *State v. Wiegand* that article I, section 10 imposes its *own* reasonableness limitation on the scope and duration of a "*Terry* detention" in the context of a traffic stop. 645 N.W.2d 125, 136 (Minn.2002). Therefore, because of article I, section 10's mandate that Minnesota's people be free from unreasonable seizures, we now explicitly adopt the principles and framework of *Terry* for evaluating the reasonableness of seizures during traffic stops even when a minor law has been violated.[6]

**6.** The special concurrence relies on Minn. R. of Crim. P. 6.01's limitation on custodial arrests instead of addressing Askerooth's contention that placing him in the back seat of the squad car violated the Minnesota Constitution. *See* Minn. R.Crim. P. 6.01, subd. 1(1)(a). There are at least three significant difficulties with relying on the procedural rule. First, while we upheld the suppression of evidence based upon a violation of Rule 6.01 in *State v. Martin*, 253 N.W.2d 404, 406 (Minn.1977) (per curiam), we did so without articulating any standard for when a violation of the rules of procedure, as distinguished from a constitutional violation, might result in the suppression of evidence. *See id.* We have since articulated such a standard, holding that only "serious violations which subvert the purpose of established procedures will justify suppression." *State, City of Minneapolis v. Cook*, 498 N.W.2d 17, 20 (Minn. 1993). We note that the special concurrence speculates that violations of Rule 6.01 "are far from 'minor and relatively insignificant,' " but we have not yet decided that issue, and we refrain from doing so here. The second difficulty with relying on Rule 6.01 is that the

rule is in tension with the in-presence arrest statute, which authorizes an arrest for a misdemeanor not amounting to a breach of the peace. *Compare* Minn.Stat. § 629.34, subd. 1(c)(1) (2002) (providing for warrantless arrest when an offense has been committed in an officer's presence), *with* Minn.Stat. § 480.059, subd. 7(f) (2002) (providing that statutes relating to arrest found in ch. 629 remain in full force and effect notwithstanding any rule of criminal procedure); *and* Minn. R.Crim. P. 6.01. The special concurrence apparently misreads Minn.Stat. § 169.91, subd. 1 (2002) as "limiting full custodial arrests for traffic offenses," but this provision only requires custodial arrests in certain situations and does not limit an officer in making a custodial arrest in other situations. Minn.Stat. § 169.91, subd. 1. The third difficulty is that, despite the assertion in the special concurrence that Rule 6.01 requires a "reasonable and proportional response to the circumstances of the offense," only article I, section 10's reasonableness requirement explicitly applies to an officer's actions from the time the officer initiates an investigative de-

## II.

■ Having concluded that article I, section 10 requires application of *Terry* principles to traffic stops, we next examine whether Schmidt's confinement of Askerooth in the squad car was an unreasonable seizure in violation of article I, section 10. A *Terry* analysis involves a dual inquiry. First, we ask whether the stop was justified at its inception. *Terry*, 392 U.S. at 19–20, 88 S.Ct. 1868; *State v. McKinley*, 305 Minn. 297, 300, 304, 232 N.W.2d 906, 909, 911 (1975) (discussing the constitutional standards embodied in the Fourth Amendment and article I, section 10, and adopting *Terry* principles for motor vehicle stops). Second, we ask whether the actions of the police during the stop were reasonably related to and justified by the circumstances that gave rise to the stop in the first place. *Terry*, 392 U.S. at 19–20, 88 S.Ct. 1868; *accord Fort*, 660 N.W.2d at 418; *Wiegand*, 645 N.W.2d at 135. Because Askerooth does not challenge the initial stop's validity, our focus is on the second prong of the *Terry* inquiry.

■ The second *Terry* prong constrains the scope and methods of a search or seizure. An initially valid stop may become invalid if it becomes "intolerable" in its "intensity or scope." *Terry*, 392 U.S. at 17–18, 88 S.Ct. 1868. Thus, each incremental intrusion during a stop must be " 'strictly tied to and justified by' " the circumstances which rendered [the initiation of the stop] permissible." *Id.* at 19, 88 S.Ct. 1868 (citations omitted); *accord State v. Gilchrist*, 299 N.W.2d 913, 917 (Minn.1980). An intrusion not closely related to the initial justification for the search or seizure is invalid under article I, section 10 unless there is independent probable cause or reasonableness to justify

that particular intrusion. *Terry*, 392 U.S. at 20–21, 88 S.Ct. 1868; *accord Wiegand*, 645 N.W.2d at 136. Thus, the justification for an initial search or seizure will not necessarily provide a basis for subsequent expansions of the scope of that search or seizure.

■ In addition, we have recognized that article I, section 10 requires that the basis for justifying an intrusion during a minor traffic stop be individualized to the driver toward whom the intrusion is directed. *Ascher*, 519 N.W.2d at 187; *Wiegand*, 645 N.W.2d at 135; *accord United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) (stating that, for a lawful stop, an officer must have a particularized and objective basis to suspect the particular person of criminal activity); *Berge v. Comm'r of Pub. Safety*, 374 N.W.2d 730, 732 (Minn.1985). This particularized basis for the intrusion must be both articulable and reasonable. *Terry*, 392 U.S. at 21, 88 S.Ct. 1868. The requirement that the basis be articulable allows for the "neutral scrutiny" of a judge to evaluate the reasonableness of the action. *Id.*

■ The basis for intrusion must be reasonable so as to comply with article I, section 10's general proscription against unreasonable searches and seizures. *Wiegand*, 645 N.W.2d at 136. To be reasonable, the basis must satisfy an objective test: "would the facts available to the officer at the moment of the seizure * * * 'warrant a man of reasonable caution in the belief' that the action taken was appropriate." *Terry*, 392 U.S. at 21–22, 88 S.Ct. 1868 (quoting *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925)); *accord State v. Othoudt*, 482

---

tention and continues to apply throughout the detention by requiring reasonableness for any increase in the intrusiveness of the stop. *See*

*Fort*, 660 N.W.2d at 417–18; *see also* our discussion of *Fort* and *Wiegand* at Section V, *infra*.

N.W.2d 218, 221 (Minn.1992). The test for appropriateness, in turn, is based on a balancing of the government's need to search or seize "and the individual's right to personal security free from arbitrary interference by law officers." *United States v. Brignoni–Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *accord State v. Ferrise*, 269 N.W.2d 888, 892 n. 1 (Minn.1978). Finally, it is the state's burden to show that a seizure was sufficiently limited to satisfy these conditions. *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion).

 In essence, Article I, Section 10 of the Minnesota Constitution requires that each incremental intrusion during a traffic stop be tied to and justified by one of the following: (1) the original legitimate purpose of the stop, (2) independent probable cause, or (3) reasonableness, as defined in *Terry*. Furthermore, the basis for the intrusion must be individualized to the person toward whom the intrusion is directed.

 Here, Askerooth challenges Schmidt's escalation of the seizure from (1) *questioning* him as he sat in his van to (2) *confining* him in the back seat of the squad car. Because the confinement of Askerooth cannot be justified by the original purpose of the stop or independent probable cause, we must consider whether this escalation was reasonable. Thus, the focus of our analysis is whether Schmidt's intensifying the intrusive nature of the seizure by confining Askerooth in the squad

car was justified by some governmental interest that outweighed Askerooth's interest in being free from "arbitrary interference by law officers." [7]

Schmidt's decision to confine Askerooth in the squad car's back seat appears to have been based on Askerooth's statement that he did not have a driver's license. Schmidt testified that, when a driver does not have a license, it is his standard procedure to place the driver in his squad car. Schmidt, with praiseworthy candor, said he does this so that "we can talk to them there while they are in the squad car with us so we don't have to go back and forth between the two vehicles." Thus, on the record before us, the only expressed basis for confining Askerooth in the squad car is officer convenience.

 The facts suggest that, to verify Askerooth's identity and license status, there was only a minimal need for Schmidt to confine him in the squad car. We acknowledge that an investigation verifying the identity of a driver who does not have a license in his possession is more extensive and inconvenient than the effort required by a stop when a driver has a license in his possession. Nevertheless, we conclude that the lack of a driver's license, by itself, is not a reasonable basis for confining a driver in a squad car's locked back seat when the driver is stopped for a minor traffic offense. *See State v. Varnado*, 582 N.W.2d 886, 891 (Minn.1998) (holding that "the inability of a minor traffic violator to produce a driv-

---

7. Askerooth's statement that he did not have a driver's license may have provided probable cause for a new misdemeanor violation, *see* Minn.Stat. § 171.08 (2002) (stating it is a misdemeanor to drive without a license in immediate possession). Askerooth's failure to provide a license would have justified extending the duration of the stop because of Schmidt's need to determine or confirm Askerooth's identity and license status. *See United*

States v. Sharpe*, 470 U.S. 675, 686, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) (stating that the duration of an investigative stop must be limited to the time reasonably necessary to complete the purpose of the stop). However, Askerooth's statement and the likely existence of probable cause of a new misdemeanor violation because he did not have a license does not change our analysis of the reasonableness of the investigative *method* used by Schmidt.

er's license in and of itself is not a reasonable basis to require the driver to sit in the back of a squad car."); *cf. State v. Curtis,* 290 Minn. 429, 436, 190 N.W.2d 631, 635 (1971) (holding that Fourth Amendment rights are protected against "routine" searches "arising out of ordinary traffic violations."). Schmidt testified that, when a driver has no license, he conducts warrant checks and name checks using his squad car computer and compares the driver's information to those results. Askerooth provided his name, date of birth, and address when Schmidt asked for this information. Based on Schmidt's testimony, this information is all he needed to conduct his identification search. Schmidt testified that he obtained a result from this search that included a physical description that matched Askerooth and also information that Askerooth did not have a valid license. Ultimately, Schmidt was able to successfully investigate Askerooth's identity using this basic information—Askerooth's name, date of birth, and address.

The state makes no suggestion that confining Askerooth in the back seat of the squad car was the only means reasonably available to accomplish the legitimate governmental interests of identifying Askerooth and verifying his license status. Neither interest mandated Schmidt's confinement of Askerooth as a method for obtaining this information. Confining Askerooth in the back of the squad car, while serving Schmidt's own interest in convenience, at most only tangentially served a governmental interest. Also, confining a driver in a squad car for officer convenience lacks any consideration for a driver's interest in being free from unnecessary intrusions. The Supreme Court has acknowledged that most drivers expect during a traffic stop to be detained briefly, asked a few questions, and then be allowed to leave after an officer either issues a citation or concludes that issuance of a citation is not warranted. *Berkemer,* 468 U.S. at 437, 104 S.Ct. 3138. In contrast, Askerooth was ordered out of his van, subjected to a pat-down search, held in the back of a police squad car, and then had his van searched before finally being released. We conclude that Askerooth's interest in being free from unreasonable seizure in these circumstances outweighed Schmidt's need for convenience because obtaining Askerooth's name, date of birth, and address did not require confinement in Schmidt's squad car. Our conclusion is buttressed by the reasoning of decisions of other courts that have addressed facts similar to those here.[8] We also note that the

8. *See United States v. Glenn,* 152 F.3d 1047, 1049 (8th Cir.1998) (holding that the decision by an officer to place a driver in a squad car to investigate the driver's identity and license status did not by itself justify a pat-down search because the decision to place the driver in the squad car, standing alone, was not a reasonable basis to believe the driver was a danger to the officer and doing so was contrary to the reasonable suspicion requirement of *Terry*); *Goss v. State,* 744 So.2d 1167, 1167–68 (Fla.Dist.Ct.App.1999) (holding that drugs found by a police officer in the back of a squad car after release of a person suspected of a crime that was neither serious nor violent should have been suppressed because the state failed to demonstrate that this increase in "the intrusive nature of the stop"

was reasonably necessary for officer safety or to prevent the suspect from fleeing); *see also State v. Moffatt,* 450 N.W.2d 116, 119 (Minn. 1990) (distinguishing the investigation of burglary from that of a petty offense in determining the reasonableness of the duration of a squad car detention); *Caldwell v. State,* 780 A.2d 1037, 1049 (Del.2001) (holding that, during a stop for a parking violation, an officer's frisking and handcuffing of the driver and a passenger while waiting for another officer to arrive exceeded the proper scope of such a stop). The special concurrence misses the point and confuses the issue when, in footnote five, it summarily dismisses *Glenn, Caldwell,* and *Goss* as inapposite authority. While the cases in varying degrees involve pat-down

cases cited by the special concurrence are based on distinguishable factual circumstances,[9] including situations that were arguably more objectively dangerous.[10]

▮▮▮▮ An alternative argument for the state is that Schmidt's ordering Askerooth out of the van was permissible without having to give a reason. Thus, Askerooth's consequential presence outside of the van created a risk to Schmidt's safety, which necessitated confinement in the squad car. It is correct that a police officer may order a driver out of a lawfully stopped vehicle without an articulated reason. *Mimms*, 434 U.S. at 111, 98 S.Ct. 330. But, even under *Mimms* there must be an additional basis, independent of an officer's command for a driver to exit a vehicle, before a more serious intrusion is permitted. *See Mimms*, 434 U.S. at 111–12, 98 S.Ct. 330 (holding that the *Terry* test controls when determining the validity of a pat-down search after a driver has been ordered out of a vehicle); *cf. Knowles v. Iowa*, 525 U.S. 113, 117, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998) (stating that a general concern for officer safety during a traffic stop does not by itself justify the intrusion of a "full field-type search."). Moreover, we are not presented with a *Mimms* kind of intrusion. Schmidt did not first order Askerooth out of the van and *then* decide to confine him in the squad car; rather, Schmidt ordered Askerooth out of the van *in the first place* so he could confine him in the squad car.

If we affirm Schmidt's actions on the basis suggested by the state, we would be establishing a rule that allows a police officer to confine a driver in a squad car simply because the driver has been ordered out of a vehicle. Such a rule would permit the same circumvention of reasonableness that we eschewed in *Varnado*. *See* 582 N.W.2d at 891 (holding that the Fourth Amendment is circumvented and undermined when an officer first decides to place a driver in the back seat of a squad car and then uses the placement as the basis for a pat-down search). Therefore, we conclude that it was unreasonable to place Askerooth in the squad car for convenience purposes and, though it would have been permissible to order Askerooth out of the van, the act of ordering Askerooth out of the van, standing alone, did not justify confining him in the squad car.

searches, it is the reasoning of these cases and how they assess the reasonableness of an officer's actions during a stop on a minor offense that support the majority's position.

9. For example, in supporting a contrary proposition, the special concurrence cites *Moffatt*, 450 N.W.2d at 120, which in turn quotes *State v. Herem*, 384 N.W.2d 880, 883 (Minn.1986). In *Moffatt*, we explained that, in light of the serious crime being investigated, the choice of leaving three suspects in a stopped car was "foolish" because of the possibility of weapons being in the car. 450 N.W.2d at 120. The most serious crime of which Askerooth could have been suspected at the time Schmidt confined him was driving without a license. *Herem* as well is readily distinguishable. In *Herem*, the confinement occurred after three to four miles of a "high speed chase" of two persons on a single motorcycle

at speeds over 100 miles per hour, after which the driver of the motorcycle had dismounted and started walking toward the officer. 384 N.W.2d at 881, 883. In *Herem*, we also observed that the officer needed to separate the driver and passenger for questioning. *Id.* at 883. Here, Askerooth made no attempt to evade Schmidt and was sitting alone in a van.

10. *See United States v. Cannon*, 29 F.3d 472, 476–77 (9th Cir.1994) (noting that defendant was "a suspected cocaine dealer" stopped in a secluded area known for drug trafficking); *see also United States v. Bradshaw*, 102 F.3d 204, 212 n. 16 (6th Cir.1996) (stating that defendant's "exiting his vehicle and approaching [an officer] in a 'nervous' and 'jittery' manner" provided a safety basis for detention).

## III.

■ The state also argues that the objective circumstances of this stop made it reasonable for Schmidt, in the interest of officer safety, to confine Askerooth in the squad car. Although Schmidt articulated no specific safety concerns during his testimony, we address this argument because the reasonableness test is an objective test. *Othoudt*, 482 N.W.2d at 223. The circumstances that the state asserts to support its argument are that the stop took place at 12:40 a.m., Askerooth did not have identification, and Schmidt was working without a partner.

We recognize the very real safety concerns associated with traffic stops in the early morning by officers working without a partner. We explicitly acknowledged the importance of officer safety in *Varnado*. 582 N.W.2d at 891 (stating "we agree that officer safety is a paramount interest"). The Supreme Court has similarly acknowledged the dangers confronted by the police during traffic stops. *See Mimms*, 434 U.S. at 110, 98 S.Ct. 330; *Michigan v. Long*, 463 U.S. 1032, 1049, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983).[11] The risks faced by police officers on a daily basis, however, do not mandate a decision for or against reasonableness in the specific encounter between Schmidt and Askerooth. Our examination of reasonableness is a fact-sensitive inquiry not susceptible to applying generalizations to a particular person or situation. For example, we have held that the absence of any individualized suspicion that a particular driver was violating any law made the temporary seizure of that driver at a DWI checkpoint unreasonable even though the checkpoint was set up in a "high accident area" where there was a "high incidence of DWI violations." *Ascher*, 519 N.W.2d at 184.

The fact that the stop occurred at 12:40 a.m. does not make the confinement reasonable. The state provides no explanation how this circumstance justifies the reasonableness of the seizure. Our review of decisions from other jurisdictions concerning the reasonableness of nighttime confinement in a police squad car indicates that such an action usually requires something more than the hours of darkness to be considered reasonable. *See, e.g., Commonwealth v. Gwynn*, 555 Pa. 86, 723 A.2d 143, 149 (1998) (noting that placement of detainee in the back of a squad car by lone officer during nighttime stop was reasonable because the officer believed the detainee intended to flee and the stop took place in a high-crime area); *see also* 4 Wayne R. LaFave, *Search and Seizure* § 9.2(d) at 39–40 (3rd ed. 1996 & 2004 Supp.) (noting that locking a suspect in the back of a squad car during an investigation would not ordinarily be permissible except where there are "unique circumstances").

11. Without question, police work is hazardous. A 2002 Federal Bureau of Investigation (FBI) report contains data from the Uniform Crime Reporting Program for the ten years from 1993–2002 documenting some of the hazards. Federal Bureau of Investigation, *Law Enforcement Officers Killed and Assaulted* (2002), *available at* http://www.fbi.gov/ucr/killed/02leoka.pdf. During these ten years, 24% of officers killed and 30% of those assaulted were killed or assaulted between midnight and 6:00 a.m. *Id.,* Table 2, Table 56. Though the report does not provide more refined statistics for this time period, overall 15.25% of officer deaths and 11% of officer assaults occurred during "Traffic pursuits/stops." *Id.,* Table 18, Table 51. In the category of "Traffic pursuit/stops," 76 of the 97 officers killed between 1993 and 2002 were in one-officer vehicles and 54 of those officers were unassisted. *Id.,* Table 24. Of the 58,066 officers assaulted during the reported period, 6,412, or 11%, were assaulted during "Traffic stops/pursuits." Of the 11% of officers assaulted during traffic stops, 73.2% were assigned to one-officer vehicles with 30.9% unassisted. *Id.,* Table 58.

Here, neither Schmidt nor the state have described anything more than a minor traffic stop that occurred at 12:40 a.m. as justification for the confinement.

Similarly, the fact that Schmidt did not know the identity of Askerooth fails to provide a basis for concluding that the confinement was reasonable. *Cf. Curtis*, 290 Minn. at 437, 190 N.W.2d at 636 (listing reasons why a search prior to placing a minor traffic violator in a squad car may be justified, including if the "motorist is known by the police to be habitually armed or to have a record of assaultive behavior"). The state does not adequately explain how Schmidt's not knowing precisely with whom he was dealing constituted a danger or necessitated the confinement. Police officers interact with complete strangers on a daily basis without resorting to such intrusions.

The state also suggests that Askerooth's failure to have a driver's license with him could have meant that he had stolen the van. We fail to see how such an inference can be made without any additional facts to support it. Schmidt testified that he observed no suspicious movement by Askerooth and that Askerooth was cooperative. Except for asking for Askerooth's license, Schmidt did not conduct any questioning until *after* Askerooth was in the squad car. We conclude there is no basis to believe that lack of identification, without more, can lead to the conclusion that confining Askerooth in the back seat of the squad car was reasonable.

The fact that Schmidt was working without a partner when he decided to confine Askerooth also fails to support the state's argument. Perhaps greater deference might be given to precautions taken by Schmidt because he was working alone if he had articulated a reasonable suspicion that Askerooth was armed or presented an imminent danger, but he did not.[12] Moreover, we allow that the special training of police officers may lead them to arrive at " 'inferences and deductions that might well elude an untrained person.' " *State v. Kvam*, 336 N.W.2d 525, 528 (Minn.1983) (quoting *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). However, the facts known to Schmidt at the time he ordered Askerooth into the squad car do not support such a reasonable inference here.

Even when we take into consideration all three of the circumstances advanced by the state—the 12:40 a.m. stop, lack of identification, and working without a partner—these circumstances fail to sufficiently supplement one another to make the sum any greater than the parts. Here, the parts do not add up to a conclusion that the confinement was reasonable. In the past when presented with circumstances that were arguably more favorable to the state's argument, we have refused to consider it to be reasonable for police officers to confine a driver in the back seat of a squad car when the driver was stopped for a minor traffic violation. *See Varnado*, 582 N.W.2d at 890 (rejecting the argument that the stop at night of a driver of a car belonging to a suspected drug-dealer in an area where police suspected the presence of drug trafficking provided a reasonable basis to believe the driver was armed and dangerous).

■ In sum, under Article I, Section 10 of the Minnesota Constitution, the state is required to justify the confinement in a squad car of a driver stopped for a minor traffic violation. Such a confinement may

---

12. When asked if he could articulate *any* reason to fear a threat from Askerooth, Schmidt could not. While not dispositive to our objective evaluation, the absence of any subjective perception of risk by Schmidt is noteworthy.

be justified if it is reasonably related to the initial lawful basis for the stop, reasonably related to the investigation of an offense lawfully discovered or suspected during the stop, or a threat to officer safety. Schmidt's confinement of Askerooth in the squad car was not reasonably related to the investigation of Askerooth's failure to obey a stop sign, nor was it reasonably related or necessary to Schmidt's investigation of Askerooth's statement that he did not have a driver's license. Further, there was no objectively reasonable threat to officer safety. We conclude that, based on the facts presented to us, a reasonable person in Schmidt's position would not conclude that confinement of Askerooth in the squad car was necessary either to effectuate the original purposes of the stop or for officer safety.

### IV.

 Our conclusion that confining Askerooth was unreasonable does not end our inquiry. We must next determine whether the methamphetamine Askerooth discarded in the squad car should be excluded on the ground that it was abandoned. We have held that evidence discovered as a result of a violation of article I, section 10 must be excluded. *Fort,* 660 N.W.2d at 419; *B.R.K.,* 658 N.W.2d at 578–79; *E.D.J.,* 502 N.W.2d at 783. When property is abandoned, however, generally the owner no longer has a reasonable expectation of privacy and the exclusionary rule will not apply. *City of St. Paul v. Vaughn,* 306 Minn. 337, 345, 237 N.W.2d 365, 370 (1975). But, if the property is abandoned because of an unlawful act by police officers, it will not be admissible as evidence. *E.D.J.,* 502 N.W.2d at 783; *Vaughn,* 306 Minn. at 346 n. 11, 237 N.W.2d at 371 n. 11.

The record is silent as to exactly when Askerooth placed the methamphetamine under the seat of the squad car. But we do know from the complaint and from the district court's findings of fact in the bench trial that Askerooth abandoned it because he was scared that the police would find it and thus the abandonment was not accidental. There appears to be no feasible way the methamphetamine would have been discovered but for the illegal seizure. Because Askerooth's abandoning of the methamphetamine is the result of an illegal seizure, we conclude that the methamphetamine must be suppressed. Therefore, we hold that the district court erred when it denied Askerooth's motion to suppress the methamphetamine discovered in the back seat of Schmidt's squad car.

### V.

 Our conclusion that Schmidt's confinement of Askerooth was unreasonable resolves this case. Nevertheless, we deem it necessary to conduct a constitutional analysis whether Schmidt's subsequent consent inquiry improperly expanded the scope of the stop and whether the extension of Askerooth's confinement during the van search improperly prolonged the stop. We conduct this analysis to provide further guidance to law enforcement when seeking consent for searches and when continuing to confine persons following the completion of the original purpose for a seizure.

The consent inquiry and van search following Schmidt's confinement of Askerooth improperly infringed on the protections of article I, section 10 as we explained those protections in *Wiegand* and *Fort.* In *Fort,* we concluded that article I, section 10 requires an officer to have reasonable articulable suspicion to expand the scope of a routine traffic stop in order to investigate other matters unrelated to the reason for the stop and to request consent to search. 660 N.W.2d at 417–18. Schmidt's request

for Askerooth's consent to search the van was not supported by any reasonable articulable suspicion. The only explanation Schmidt offered for the purpose of the search was to ensure that Askerooth would not have access to any weapons in the van. Although Schmidt's explanation invokes officer safety,[13] it is not supported by any claim that Askerooth was a safety threat when he was confined. We note that when Schmidt asked for consent, he knew that Askerooth could not legally drive the van and that Askerooth's address was three blocks from where the van was legally parked. Similarly, Schmidt did not articulate any basis for believing there was anything in the van that Askerooth could have used as a weapon or that Askerooth would attempt to use a weapon after being released.

In *Wiegand*, we concluded that article I, section 10 imposes a reasonableness limitation on the duration and the scope of an investigative detention. 645 N.W.2d at 136. We reiterated that an extension of the duration of a stop beyond the time necessary to effectuate the purposes of the stop is unreasonable. *Id.* at 135; *see also State v. Blacksten,* 507 N.W.2d 842, 846 (Minn.1993) (citing *United States v. Sharpe,* 470 U.S. 675, 686, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985)). Schmidt's prolonging of Askerooth's detention in order to conduct the van search included both an expansion of the scope of the seizure—detaining Askerooth in order to conduct a search—as well as an extension of the duration of the detention beyond the original purpose of the stop. The results from Schmidt's computer search were sufficient to allow him to complete his investigation of Askerooth's identity and license status; in fact, he testified that he could have

issued the citations to Askerooth at this time. At that point, Schmidt, absent a reasonable articulable suspicion of some additional crime or danger, was required to issue the citations and allow Askerooth to leave, but Schmidt did not issue the citations until after he finished searching Askerooth's van. Schmidt also did not release Askerooth from the back of the squad car until after the search. We hold that Schmidt's request for Askerooth's consent to search the van exceeded the scope of the stop and his prolonged detention of Askerooth beyond the time necessary to effectuate the purpose of the stop violated Article I, Section 10 of the Minnesota Constitution. *Fort,* 660 N.W.2d at 417–18; *Wiegand,* 645 N.W.2d at 136.

Reversed.

RUSSELL A. ANDERSON and HANSON, JJ., Concurring specially.

RUSSELL A. ANDERSON, Justice (concurring specially).

Although I concur in the result the court reaches today, I disagree with the majority's reasoning with respect to the temporary detention of the traffic violator in this case. Inasmuch as our criminal rules place strict limitations on custodial arrests for minor crimes, I see no principled basis for resort to our state constitution to make a break from the *Atwater* majority. The criminal rules require a reasonable and proportional response to the circumstances of the offense; and we have long held that a temporary detention in a squad car is not a de facto arrest. In my view, the placement of an unlicensed driver in a squad car in the early morning hours for purposes of ascertaining and verifying the driver's identity and to abate criminal con-

---

13. We noted in both *Wiegand* and *Fort* that our holdings in those cases did not limit an officer's search conducted under *Terry*'s rea-

sonableness framework for safety purposes. *Wiegand,* 645 N.W.2d at 136; *Fort,* 660 N.W.2d at 419 n. 2.

duct is permissible under our criminal rules and prior case law. Nevertheless, because the detention in this case went beyond the scope and duration of the traffic stop, I would reverse.

The relevant facts, briefly stated, are these. At about 12:40 a.m. on April 21, 2001, while on routine patrol and working alone, St. Paul Police Officer Thaddus Schmidt observed a van run a stop sign at Burgess and Farrington. The officer activated the squad car's emergency lights and followed the van for a block and a half before the vehicle pulled over. The officer approached the van and asked the driver, the only occupant in the van, for his driver's license. The driver said he did not have one. The officer asked the driver to step out of the vehicle, did a quick patdown for weapons and placed the driver in the back seat of the squad car. The driver identified himself as Todd Askerooth and provided his date of birth and address. A records check verified that Askerooth's driver's license had been revoked. While Officer Schmidt was talking to Askerooth in the squad car, two other officers arrived.

Officer Schmidt told Askerooth that he was going to issue a ticket for driving after revocation and running the stop sign. While still in the squad car, the officer asked for and obtained Askerooth's consent to search the van. As Askerooth sat in the back of the squad car, the officers searched the van. After the search, Officer Schmidt issued a citation for the traffic violations and advised Askerooth to lock the van and walk home. As Askerooth walked away, the officer found the methamphetamine that Askerooth later admitted he had "dumped" in the back seat.

Askerooth moved to suppress the methamphetamine, arguing that while the initial detention in the squad car was permissible, the continued detention for the consent inquiry and search of the van was unreasonable. The district court found that Askerooth was temporarily placed in the squad car for purposes of ascertaining identity and that beyond that point, it was an issue of abandonment and denied the motion to suppress. On appeal, the court of appeals affirmed, concluding that on the facts of this case, the temporary detention in the squad car was not unreasonable. *State v. Askerooth*, No. C6–02–318, 2003 WL 230673, at *2 (Minn.App. Feb.4, 2003).

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures * * *." U.S. Const. amend. IV. The United States Supreme Court has held that the Fourth Amendment does not forbid a warrantless arrest for a minor criminal offense such as a misdemeanor seatbelt violation punishable only by a fine. *Atwater v. City of Lago Vista*, 532 U.S. 318, 323, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001). But states may provide their citizens with a higher level of protection than that afforded by the United States Constitution. *Sibron v. New York*, 392 U.S. 40, 60–61, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) (states may develop laws regarding search and seizure but may not authorize conduct that violates the Fourth Amendment). *Atwater* recognized that many jurisdictions have chosen to impose more restrictive limitations on warrantless arrests for minor offenses and indicated that it might be easier "to devise a minor-offense limitation by statute than to derive one through the Constitution * * *." *Atwater*, 532 U.S. at 352, 121 S.Ct. 1536.

Minnesota has had the "limiting proviso" referred to in *Atwater* for nearly 30 years. Since their inception in 1975, the criminal procedural rules have required law enforcement officers to issue citations in misdemeanor cases "unless it reason-

ably appears to the officer that arrest or detention is necessary to prevent bodily harm to the accused or another or further criminal conduct, or that there is a substantial likelihood that the accused will fail to respond to a citation." Minn. R.Crim. P. 6.01, subd. 1(1)(a).[1] The limitations on full custodial arrests for misdemeanors have long been enforced through exclusionary rules. *See State v. Martin,* 253 N.W.2d 404, 406 (Minn.1977) (search not justified as incident to an arrest that violated Rule 6.01); *State v. Richmond,* 602 N.W.2d 647, 653 (Minn.App.1999) (same); *State v. Evans,* 373 N.W.2d 836, 838 (Minn.App.1985) (same); *cf. State v. Brown,* 345 N.W.2d 233, 237 (Minn.1984) (full custodial misdemeanor arrest justified because officer "was aware that defendant had previously failed to appear for citations issued to him."). For felonies and gross misdemeanors, the rules permit, rather than require, citations in lieu of arrest. Minn. R.Crim. P. 6.01, subd. 2.[2] Consistent with *Terry v. Ohio,* 392 U.S. 1, 20–22, 26–27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), Minnesota's criminal rules require that custodial arrests be a reasonable and proportional response to the circumstances of the offense.[3] Consequently,

---

**1.** Minn. R.Crim. P. 6.01, subd. 1(1)(a) provides:

> Law enforcement officers acting without a warrant, who have decided to proceed with prosecution, shall issue citations to persons subject to lawful arrest for misdemeanors, unless it reasonably appears to the officer that arrest or detention is necessary to prevent bodily harm to the accused or another or further criminal conduct, or that there is a substantial likelihood that the accused will fail to respond to a citation. The citation may be issued in lieu of an arrest, or if an arrest has been made, in lieu of continued detention. If the defendant is detained, the officer shall report to the court the reasons for the detention. Ordinarily, for misdemeanors not punishable by incarceration, a citation shall be issued.

**2.** Minn. R.Crim. P. 6.01, subd. 2 provides:

> When a law enforcement officer acting without a warrant is entitled to make an arrest for a felony or gross misdemeanor or a person arrested without a warrant for a felony or gross misdemeanor is brought to a police station or county jail, the officer in charge of the police station or the county sheriff in charge of the jail or an officer designated by the sheriff may issue a citation in lieu of arrest or in lieu of continued detention if an arrest has been made; unless it reasonably appears to the officer that arrest or detention is necessary to prevent bodily harm to the accused or another or further criminal conduct or that the accused may fail to appear in response to the citation.

**3.** "There are significant qualitative differences between a traffic stop and a full custodial arrest." *Atwater v. City of Lago Vista,* 532 U.S. at 363, 121 S.Ct. 1536 (O'Connnor, J., dissenting). The former is limited in scope and permits a warrantless pat-down of the detainee's outer clothing only if the officer has a reasonable belief that the detainee is "armed and presently dangerous to the officer or others." *Terry,* 392 U.S. at 24, 88 S.Ct. 1868. Unlike the limited pat-down search, as a search incident to an arrest, an officer may conduct a full search of the arrestee and of the area within the arrestee's immediate control for weapons and evidence. *Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). The search-incident rules apply so long as the custodial arrest is valid, although in 1973 members of the Supreme Court questioned the validity of a full custodial arrest for a minor traffic offense. *Gustafson v. Florida,* 414 U.S. 260, 266–67, 94 S.Ct. 494, 38 L.Ed.2d 427 (1973) (Stewart, J., concurring) ("[A] persuasive claim might have been made * * * that the custodial arrest of the petitioner for a minor traffic offense violated [the Fourth Amendment]. But no such claim has been made."); *United States v. Robinson,* 414 U.S. 218, 238 n. 2, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) (Powell, J., concurring) (stating that the validity of the custodial arrest for a minor traffic offense was not "self-evident"). Minnesota's criminal procedural rules addressed the *Robinson–Gustafson* rule with strict limitations on custodial arrests for minor offenses. *State v. Martin,* 253 N.W.2d 404, 405–06 (Minn.1977) (issue of constitutional validity of a full custo-

I see neither the need nor the purpose in recognizing limitations on custodial arrests under the state constitution, particularly where the criminal rules have been workable and easily applied by officers on the street. *See* Richard S. Frase, *What Were They Thinking? Fourth Amendment Unreasonableness in Atwater v. City of Lago Vista*, 71 Fordham L.Rev. 329, 415 (2002) ("The experience of Minnesota * * * shows that strict limitations on police powers to arrest for minor offenses are workable in practice and pose no threat to law enforcement and public safety.").[4]

During the course of a lawful *Terry* stop for a traffic offense, a police officer may direct a person to provide identification. *State v. White*, 489 N.W.2d 792, 793 (Minn. 1992) (citing *United States v. Hensley*, 469 U.S. 221, 229, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985)). An officer may also order the

driver and passengers out of the vehicle. *Maryland v. Wilson*, 519 U.S. 408, 415, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997); *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n. 6, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (per curiam). And the placement of a lawfully stopped motorist in a police car for a short period of time does not automatically "take the situation beyond the realm of the ordinary traffic stop." *State v. Moffatt*, 450 N.W.2d 116, 120 (Minn. 1990) (quoting *State v. Herem*, 384 N.W.2d 880, 883 (Minn.1986) (lone deputy's separation of occupants of motorcycle, placing one in a police car, was prudent under the circumstances)); *but see State v. Varnado*, 582 N.W.2d 886, 891 (Minn.1998) (officers could not circumvent the reasonableness requirement for a *Terry*-type frisk by requiring a minor traffic violator to sit in the squad car).[5] In evaluating the reasonable-

---

dial arrest for the minor offense not reached because Minn. R.Crim. P. 6.01, subd. 1(1)(a) provides for citations in lieu of arrest). In Minnesota, *Terry* principles apply to traffic stops. *State v. McKinley*, 305 Minn. 297, 304, 232 N.W.2d 906, 911 (1975).

4. There is no tension, as the majority suggests, between Minn.Stat. § 629.34 (2002) (common-law in-presence requirement for misdemeanor arrests) and Rule 6.01 that recognizes the concept of the " 'custodial arrest,' a special subset of the broader category of 'arrest' that did not even exist [under federal law] until created in *United States v. Robinson* [.]" 3 Wayne R. LaFave, *Search and Seizure* § 5.1(h) at 34 (Supp.2004). Minnesota, however, had recognized that special subset of arrests for traffic offenses before *Robinson*. *See* Minn.Stat. § 169.91, subd. 1 (2002) (limiting full custodial arrests for traffic offenses). Rule 6.01 extended the limitation on custodial arrests for all misdemeanors and ordinance violations. Minn. R.Crim. P. 6 cmt.-Rule 6. As for the exclusionary rule, we have said that "[p]rocedural defects which are minor and relatively insignificant need not require suppression. On the other hand, serious violations which subvert the purpose of established procedures will justify suppression." *State, City of Minneapolis v. Cook*, 498 N.W.2d 17,

20 (Minn.1993). Violations of Rule 6.01 are far from "minor and relatively insignificant." It may be that state constitutional policymaking is justified when necessary to "clarify sometimes confusing federal case law so that the * * * courts can apply rules more easily" or, when "effective law enforcement is not hampered, * * * in order to increase the amount of privacy protection a state affords its citizens." Wesley D. Dupont, *Automobile Searches and Judicial Decisionmaking Under State Constitutions: State v. Miller*, 27 Conn. L.Rev. 699, 721–22 (1995). Our criminal rules, however, accomplished those objectives long ago: "Minnesota * * * has had [the *Atwater* limiting proviso] for more than 25 years and enforces the limitation via an exclusionary rule, all suggesting that the police there have managed to make the judgments provided by their proviso." LaFave, *supra* at 27. By excepting traffic stops from that limiting proviso and undermining the case law that enforced limitations on custodial arrests, it may very well be that the majority has also undermined the limitations on custodial arrests for all other non-traffic misdemeanors and ordinance violations.

5. Courts elsewhere have concluded that a traffic violator can be detained in a police car while the officer verifies the driver's license,

ness of a traffic stop, the subjective intent of the police officer is not a relevant consideration. *Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).

Here, Askerooth, who said he had no driver's license, was detained in the back seat of the squad car in the early morning hours in mid-April while the lone officer verified his identity and checked his driving record. The check came back that Askerooth's driver's license had been revoked, and the officer issued a citation for driving after revocation and running the stop sign. It seems to me that the temporary detention under these circumstances was prudent and permissible. *See* Minn. R.Crim. P. 6.01, subd. 1 (detention permissible to prevent further criminal conduct or if there is a substantial likelihood that the suspect will fail to respond to a citation); *cf. Atwater,* 532 U.S. at 365, 121 S.Ct. 1536 (O'Connor, J., dissenting) (warrantless arrest permissible "to abate criminal conduct[,] * * * verify the offender's identity and, if the offender poses a flight risk, to ensure her appearance at trial."). In my view, allowing an unidentified and

unlicensed driver to retain control of his vehicle or stand along the roadway while the lone police officer returns to his squad car to do a computer search of a database and complete the investigation, including a determination of the identity of the driver, neither follows sound jurisprudence nor serves sound police protocol.

The scope and duration of a traffic stop investigation, however, "must be limited to the justification for the stop." *State v. Fort,* 660 N.W.2d 415, 418 (Minn.2003) (citing *State v. Wiegand,* 645 N.W.2d 125, 135 (Minn.2002)). In *Fort,* the defendant was a passenger in a vehicle that had been stopped for a routine traffic violation; but the police proceeded with a drug investigation without any reasonable articulable suspicion. We reinstated the district court's suppression order, holding that the police expansion of the routine traffic stop beyond the underlying justification for the stop violated the state constitution. *Id.* at 419.

Here, after concluding the traffic violation investigation, the officer asked for consent to search the van; and while Aske-

---

checks on the status of the license and registration and issues a citation as these acts are within the purposes of the initial stop. *See, e.g., United States v. White,* 81 F.3d 775, 778 (8th Cir.1996), *cert. denied,* 519 U.S. 1011, 117 S.Ct. 518, 136 L.Ed.2d 406 (1996) (stating that officer may ask for license and registration, request driver to sit in patrol car, and check for outstanding warrants); *United States v. Bradshaw,* 102 F.3d 204, 212 (6th Cir.1996), *cert. denied,* 520 U.S. 1178, 117 S.Ct. 1453, 137 L.Ed.2d 558 (1997) (detention in patrol car during radio checks and issuance of citation); *United States v. Cannon,* 29 F.3d 472, 477 (9th Cir.1994) (detention in patrol car during computer check of identification card to verify that driver's license had been suspended); *United States v. Parr,* 843 F.2d 1228, 1230–31 (9th Cir.1988) (defendant's failure to produce a valid driver's license "justified the request that he get out of his car and sit in the police car while a

standard police identification process took place" but the request did not constitute an arrest). Cases cited by the majority for a contrary conclusion are inapposite, having more to do with a pat-down search for weapons. *E.g., United States v. Glenn,* 152 F.3d 1047, 1049 (8th Cir.1998) ("An officer's decision to place a traffic offender in the back of a patrol car does not create a reasonable, articulable suspicion to justify a pat-down search that the circumstances would not otherwise allow."); *Caldwell v. State,* 780 A.2d 1037, 1049 (Del.2001) (valid traffic stop for parking violation ended when officer frisked and handcuffed driver and waited for backup). In *Goss v. State,* 744 So.2d 1167 (Fla.Dist.Ct. App.1999), the court there held that an officer was not justified in placing an individual in a patrol car during an investigatory stop for suspicion that the individual had charged a motorist to park in a city-owned parking lot. *Id.* at 1168–69.

rooth was still locked in the back seat of the squad car, three police officers searched his van. Although Askerooth asserted that his detention in the squad car "became absolutely unreasonable" because of the consent inquiry and subsequent search, the district court concluded that it was simply a matter of abandonment. However, abandonment will not be found where property is discarded by the unlawful presence or pursuit by police officers. *In re E.D.J.*, 502 N.W.2d 779, 783 (Minn. 1993); *City of St. Paul v. Vaughn*, 306 Minn. 337, 345, 237 N.W.2d 365, 370 (1975).

The state bears the burden of establishing the validity of a warrantless search or seizure. *See State v. Fitzgerald*, 562 N.W.2d 288, 288 (Minn.1997) (state bears the burden of establishing the existence of an emergency justifying a warrantless entry under the emergency exception to the warrant requirement); *State v. Mastrian*, 285 Minn. 51, 56, 171 N.W.2d 695, 699 (1969) (upon challenge to a warrantless arrest, state has the burden of proving that the arrest did not violate the Fourth Amendment). On the record before us, I agree with the majority that it cannot be said the state sustained its burden of showing that the methamphetamine was discarded during the lawful portion of the detention, thus requiring reversal of the conviction and suppression of the evidence.