**STATE of Minnesota, Respondent,**

v.

**Kellie Jo KRENIK, Appellant.**

No. A08–1851.

Court of Appeals of Minnesota.

Oct. 27, 2009.

Lori Swanson, Attorney General, St. Paul, MN, Susan Gaertner, Ramsey County Attorney, Mitchell L. Rothman, Assistant County Attorney, St. Paul, MN, for respondent.

Seamus R. Mahoney, St. Paul, MN, for appellant.

Considered and decided by ROSS, Presiding Judge; PETERSON, Judge; and SCHELLHAS, Judge.

## OPINION

PETERSON, Judge.

In this appeal from a conviction of a first-degree controlled-substance offense, appellant Kellie Krenik argues that the district court erred in denying her motion to suppress evidence of drug possession found during a pat search and a vehicle search that were conducted after police directed her to get out of her vehicle, which she had been riding in as a passenger when it was stopped by police for a traffic violation. We affirm.

## FACTS

Officer Grant Dattilo stopped Krenik's vehicle for failing to signal a lane change and for having an object suspended from the rearview mirror. Krenik was the front-seat passenger in the vehicle, which

was being driven by Krenik's friend, Deborah Etoll. Etoll told Dattilo that she did not have her driver's license with her, but she gave him her full name so that he could check her driver's license status. Krenik gave Dattilo proof of insurance for the vehicle. Dattilo returned to his squad car and learned that Krenik was the registered owner of the vehicle and that the proof of insurance was valid. He also learned that Etoll's driver's license had been suspended.

Dattilo returned to the stopped vehicle and asked "Etoll to step out of the vehicle and to meet [him] back by [his] squad car so [they] could talk about her driver's license status." He asked Etoll why she was driving Krenik's vehicle, and she explained that Krenik had had a miscarriage earlier in the day, that Krenik was distraught, and that Etoll felt that it would be safer for her to drive. Dattilo issued Etoll a citation for driving on a suspended license and told her to remain seated on the curb while he returned to the stopped car to speak with Krenik.

Another officer, Erin Reski, had arrived at the scene, and the officers approached the passenger's side of the vehicle together. Dattilo had already asked Krenik if she needed medical assistance, and she had told him that she did not. The passenger's window was down, and Dattilo testified that he "told [Krenik] that [the officers] were going to have her take a step out of [the] vehicle." He testified that the officers asked Krenik to step out of the vehicle because Etoll would not be able to drive due to her suspended license and the officers "wanted to make sure that it was safe for [Krenik] to drive for her own sake and for the sake of the general public." Reski testified that they asked Krenik to exit the vehicle because Krenik appeared very "distraught" and that "it was obvious [that the officers] needed to

check her mental status and her safety to make sure she was okay to be driving." Reski also testified that Krenik was "unable to answer any of the questions [Reski] was asking." The officers knew that Krenik had a valid driver's license.

When Dattilo told Krenik to step out of the vehicle, he also told her to keep her hands out of her pockets. As Krenik stepped out of the vehicle, Reski noticed "a larger, bulky object" in the front pouchpocket of Krenik's sweatshirt. About five seconds after Krenik stepped out of the vehicle, she put her hands in the front pocket. Dattilo told her to remove her hands from her pocket. Reski then determined that for the officers' safety, she should perform "a quick frisk to make sure the area where [Krenik's] hands were [did not have] weapons." Reski explained that she "went straight for the front pouch just because that was the most central location for [Krenik's] hands."

Reski testified during direct examination that as she patted the outside of Krenik's pocket she "could feel a smoking glass tube." From her prior experience, she recognized "that to be a smoking tube from—use that with narcotics." After feeling the tube, Reski reached into Krenik's pocket and removed it; it was a type of pipe used for smoking narcotics. Dattilo saw burn marks on the pipe. Reski then removed from Krenik's pocket a container labeled as Johnson & Johnson baby wipes. Reski testified that the container was approximately six by two or three inches, and that "[d]ue to its size, it could be used to hold ... a smaller caliber handgun [or] a knife." When she opened the container, she found a substance that appeared to be methamphetamine.

During cross-examination, Reski admitted that when she felt the outside of Krenik's pocket, she was not certain that the tube was a pipe for smoking narcotics.

The following exchange occurred between Krenik's attorney and Reski.

Q: ... So you feel a tube with a small bulb at the end of it, right?

A: Correct.

Q: Now, you didn't know what that was at the time, right?

A: Correct.

Q: You weren't sure, correct?

A: Correct.

Q: Okay. It could have been a glass pipe as it turned out to be, right?

A: Affirmative.

Q: Okay. It could have been something else, right?

A: It could have been.

After discovering the contraband, Reski arrested Krenik for possession of a controlled substance. Because there was no other licensed driver at the scene, the officers decided that the vehicle had to be towed. Reski conducted an inventory search of the vehicle and discovered a black purse in the passenger compartment that contained "small baggies, commonly used to package narcotics." She also found a scale in the purse and a second scale in the vehicle.

Krenik moved to suppress the evidence discovered in her pocket and in the vehicle. After Dattilo, Reski, Etoll, and Krenik testified at the hearing on the motion, the district court orally ruled that the traffic stop and the pat search were lawful and that Reski lawfully seized the glass pipe from Krenik's pocket because "the plain-feel exception is valid in Minnesota" and Reski "certainly [had] a basis to suspect that was a crack pipe based on her training and experience." The district court reasoned that after seizing the pipe and seeing drug residue, Reski could lawfully search the baby-wipe box that she felt in Krenik's pocket because it "could hold an illegal substance" and possibly "a weapon

that could have been of danger to the officers." But the district court declined to rule on the suppression motion from the bench, stating that "the most important issue in this case is whether or not [the officers] could ask [Krenik] to get out of the car" because "once she was out of the car and [the officer] saw the bulge then things went downhill from there."

The district court later filed a written order addressing the unresolved issue from the hearing. The court concluded "that an officer may ask a passenger to exit a lawfully stopped vehicle" and that "an officer can lawfully make this request without any particular justification." The court also noted that in Krenik's case, the officers "had a reason to ask [her] to step out of [her] car; they were concerned about her physical and emotional ability to drive the car." The district court concluded that it was reasonable for the officers to ask Krenik to exit the vehicle because they had "to fully assess the situation and dispel any concerns for the safety of [Krenik] and the public." Accordingly, the district court denied Krenik's motion to suppress.

## ISSUES

I. Does a police officer need an individualized justification for directing a passenger in a legally stopped vehicle to get out of the vehicle?

II. Was the identity of the item that the officer felt in Krenik's pocket during the pat search sufficiently apparent to apply the plain-feel exception to the warrant requirement?

## ANALYSIS

Krenik challenges the district court's determination that the officers had a legal basis to seize and search her. She contends that the seizure was unreasonable under the Fourth Amendment and also

under Article I, section 10, of the Minnesota Constitution and that even if the seizure and pat search did not violate her constitutional rights, the contraband discovered during the pat search must be suppressed because the district court erroneously applied the plain-feel doctrine.

## I.

■ "When reviewing pretrial orders on motions to suppress evidence, we may independently review the facts and determine, as a matter of law, whether the district court erred in suppressing—or not suppressing—the evidence." *State v. Harris*, 590 N.W.2d 90, 98 (Minn.1999). The district court's findings of fact are reviewed for clear error. *State v. Lee*, 585 N.W.2d 378, 383 (Minn.1998).

■ The United States and Minnesota Constitutions guarantee individuals the right to be free from unreasonable searches and seizures. U.S. Const. amend. IV; Minn. Const. art. I, § 10. In interpreting Article I, section 10, of the Minnesota Constitution, the Minnesota Supreme Court has explicitly adopted the principles and framework of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), for evaluating the reasonableness of seizures during traffic stops when a minor law has been violated. *State v. Askerooth*, 681 N.W.2d 353, 363 (Minn.2004).

> A *Terry* analysis involves a dual inquiry. First, we ask whether the stop was justified at its inception. Second, we ask whether the actions of the police during the stop were reasonably related to and justified by the circumstances that gave rise to the stop in the first place.

*Id.* at 364 (citations omitted).

■ "An intrusion not closely related to the initial justification for the search or seizure is invalid under article I, section 10 unless there is independent probable cause

or reasonableness to justify that particular intrusion." *Id.*

The basis for intrusion must be reasonable so as to comply with article I, section 10's general proscription against unreasonable searches and seizures. To be reasonable, the basis must satisfy an objective test: "would the facts available to the officer at the moment of the seizure warrant a man of reasonable caution in the belief that the action taken was appropriate."

*Id.* (omission in original) (quoting *Terry*, 392 U.S. at 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889) (other quotation and citation omitted). "The test for appropriateness, in turn, is based on a balancing of the government's need to search or seize 'and the individual's right to personal security free from arbitrary interference by law officers.'" *Id.* at 365 (quoting *United States v. Brignoni–Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 2579, 45 L.Ed.2d 607 (1975)). The state bears the burden to show that a seizure was sufficiently limited to satisfy these conditions. *Id.*

The supreme court concluded in *Askerooth*:

> In essence, Article I, Section 10 of the Minnesota Constitution requires that each incremental intrusion during a traffic stop be tied to and justified by one of the following: (1) the original legitimate purpose of the stop, (2) independent probable cause, or (3) reasonableness, as defined in *Terry*. Furthermore, the basis for the intrusion must be individualized to the person toward whom the intrusion is directed.

*Id.* at 365.

■ Krenik argues that the incremental intrusion of the officers directing her to get out of her vehicle was not justified. We agree with the district court that "this whole case is determined by whether or not the officers could require [Krenik] to

get out of the vehicle." The initial traffic stop was reasonable because Dattilo stopped the vehicle after he observed a traffic violation. *See Whren v. United States,* 517 U.S. 806, 810, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89 (1996) (explaining that a vehicle stop is reasonable when officer has probable cause to believe driver committed traffic violation); *State v. Wiegand,* 645 N.W.2d 125, 135 (Minn.2002) (explaining that a traffic stop "is lawful if there is a particularized and objective basis for suspecting the person stopped of criminal activity") (citation omitted). And if the officers could require Krenik to get out of the vehicle, Krenik's disobeying the officers' commands and putting her hands in the pocket with a large bulge justified a pat search for officer safety. *See, e.g., State v. Harris,* 590 N.W.2d 90, 104 (Minn. 1999) (explaining that pat search justified by unusual nervousness, furtive movements, and attempt to conceal object); *State v. Cavegn,* 294 N.W.2d 717, 721–22 (Minn.1980) (noting pat search justified based on suspect's nervousness, suspect's clutching object close to body, and lateness of hour). Consequently, our resolution of the case depends on whether the officers had a valid basis for ordering Krenik to get out of her vehicle.

The incremental intrusion of ordering Krenik to get out of her vehicle was not justified by Etoll's driving violation, which was the original purpose for the traffic stop. And the officers did not have independent probable cause that justified their ordering Krenik out of the car and searching her. Therefore, under *Askerooth,* directing Krenik to get out of the vehicle was justified only if it was reasonable, "as defined in *Terry.*" 681 N.W.2d at 365.

The United States Supreme Court has determined that directing a passenger to get out of a vehicle as a matter of course during a traffic stop is reasonable, as defined in *Terry.* Applying *Terry* principles in *Pennsylvania v. Mimms,* the Supreme Court held "that once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." 434 U.S. 106, 111 n. 6, 98 S.Ct. 330, 333 n. 6, 54 L.Ed.2d 331 (1977). *Mimms* relied on the rationale that the "inordinate risk" posed to officers involved in traffic stops outweighs the minor additional intrusion of ordering a driver out of the car. *Id.* at 109–11, 98 S.Ct. at 332–33. The Minnesota Supreme Court explicitly recognized this holding when it noted in *Askerooth* that "[i]t is correct that a police officer may order a driver out of a lawfully stopped vehicle without an articulated reason." 681 N.W.2d at 367 (citing *Mimms,* 434 U.S. at 111, 98 S.Ct. at 330).

Two decades after deciding *Mimms,* the United States Supreme Court extended the *Mimms* holding to passengers in lawfully stopped vehicles. *Maryland v. Wilson,* 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997). In *Wilson,* the Supreme Court held "that an officer making a traffic stop may order passengers to get out of the car pending completion of the stop." *Id.* at 415, 117 S.Ct. at 886.[1] In an

---

1. The dissent contends that under *Mimms* and *Wilson,* Dattilo's request that Krenik get out of the vehicle needed to be based on concerns about officer safety, and, therefore, because officer-safety concerns did not motivate Dattilo and Reski, the seizure was unconstitutional. But the officer in *Mimms* did not have particular officer-safety concerns about the driver whom he asked to step out of a stopped vehicle; it was "his practice to order all drivers out of their vehicles as a matter of course whenever they had been stopped for a traffic violation." 434 U.S. at 109–10, 98 S.Ct. at 333. In the absence of particularized officer-safety concerns, the Supreme Court held "that once a motor vehicle has been lawfully

opinion released after this court heard oral arguments in this matter, the Minnesota Supreme Court cited *Wilson* and determined that the officer who lawfully stopped the vehicle in which Ortega was a passenger "was justified in having Ortega leave the vehicle as the vehicle was already stopped and the only change was that Ortega was outside, instead of inside, the vehicle." *State v. Ortega*, 770 N.W.2d 145, 152 (Minn.2009). The supreme court said in *Ortega* that in the context of traffic stops, Article I, section 10, of the Minnesota Constitution provides individuals greater protection than the Fourth Amendment to the United States Constitution. *Id.* But the court's application of the *Wilson* holding indicates that this greater protection does not require that police have an individualized basis for ordering a passenger to get out of a lawfully stopped vehicle.[2]

In light of the supreme court's express recognition of *Mimms* in *Askerooth* and its application of *Wilson* in *Ortega*, we conclude that because Krenik was a passenger in a lawfully stopped vehicle, the officers did not violate Article I, section 10, of the Minnesota Constitution when they ordered Krenik to get out of her vehicle. Reski's command for Krenik to exit the vehicle

was reasonable under *Terry*, and Krenik's status as a passenger was sufficient to justify the incremental intrusion.

Krenik also argues that because the officers' command to exit the vehicle occurred after the stop was resolved, the command unreasonably expanded the duration of the stop. But the traffic stop was not completed when the officers directed Krenik to get out of the vehicle. The officers still needed to decide what to do with Krenik's vehicle. Etoll did not have a driver's license and could not drive the vehicle, and in light of Etoll's statement that she thought it would be safer for her to drive because Krenik was distraught, the officers needed to determine whether Krenik could drive. *See Arizona v. Johnson*, —— U.S. ——, ——, 129 S.Ct. 781, 788, 172 L.Ed.2d 694 (2009) ("Normally, the stop ends when the police have no further need to control the scene and inform the driver and passengers they are free to leave.").

## II.

■ The district court ruled that under the plain-feel exception to the warrant requirement, Reski could seize the items in Krenik's pocket. Krenik argues that the

detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." *Id.* at 111 n. 6, 98 S.Ct. at 333 n. 6. In *Wilson*, the Supreme Court explained that *Mimms* drew a bright line and that the principles that underlay *Mimms* apply to passengers as well. 519 U.S. at 413 n. 1, 117 S.Ct. at 885 at n. 1. We understand the bright-line rule of *Mimms* and *Wilson* to be that during the course of a lawful traffic stop, an officer may order a driver or passenger to get out of the stopped vehicle as a matter of course.

2. The dissent contends that the *Ortega* court's sole justification for allowing the officer to remove Ortega from the vehicle was that the acting officer had a legitimate concern for

officer safety. But the supreme court said in *Ortega* that the officer

was justified in having Ortega leave the vehicle as the vehicle was already stopped and the only change was that Ortega was outside, instead of inside, the vehicle. Further, [the officer] was a sole officer stopping a vehicle with two occupants. He had a valid officer-safety concern in having Ortega stand away from the passenger compartment. Thus, we conclude that it was reasonable to have Ortega exit the vehicle and stand away from the passenger compartment while it was being searched.

770 N.W.2d at 152. It is apparent that the officer-safety concern was a further justification for having Ortega leave the vehicle and stand away from the passenger compartment; it was not the sole justification.

plain-feel exception did not apply because the identity of the item that Reski felt during the pat search was not sufficiently apparent.

The United States Supreme Court recognized a plain-feel exception to the warrant requirement in *Minnesota v. Dickerson*, 508 U.S. 366, 375 113 S.Ct. 2130, 2137, 124 L.Ed.2d 334 (1993). This court recognized that the plain-feel exception applies to Article 1, section 10, of the Minnesota Constitution in *State v. Burton*, 556 N.W.2d 600, 603 (Minn.App.1996), *review denied* (Minn. Feb. 26, 1997). The Supreme Court explained in *Dickerson* that

> [i]f a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view doctrine.

*Id.* at 375–76, 113 S.Ct. at 2137.

The phrase "immediately apparent" does not mean that an officer must be certain about the object's identity; rather, an officer must "have probable cause to believe that the item is contraband before seizing it." *Id.* at 376, 113 S.Ct. at 2137. The Supreme Court has explained with respect to the plain-view doctrine that " 'immediately apparent' was very likely an unhappy choice of words, since it can be taken to imply that an unduly high degree of certainty as to the incriminatory character of evidence is necessary." *Texas v. Brown*, 460 U.S. 730, 741, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983) (plurality decision).

Reski's testimony demonstrates that it was immediately apparent to her that the glass tube in Krenik's pocket was contraband. Reski testified that when she pat-ted down the outside of Krenik's pocket, she "could feel a smoking glass tube" and recognized it as contraband from her prior experience. Although Reski admitted during cross-examination that she could not be certain that the object was a glass pipe and it "could have been something else," the "immediately apparent" standard does not require absolute certainty. *Brown*, 460 U.S. at 741, 103 S.Ct. at 1543. Reski's testimony adequately supports the district court's finding that Reski had a "basis to suspect that [the item] was a crack pipe" when she felt it. Therefore, Reski's warrantless seizure of the pipe was permitted under the plain-feel exception to the warrant requirement.

Krenik also argues that "the retrieval of the unopened baby wipes box ... is not justifiable under the 'plain-feel' doctrine [because] this item could not have been recognized as ... any kind of contraband." But Krenik's argument ignores Reski's other reason for seizing the box, to confirm that it did not contain a weapon. The scope of a pat search extends to all "concealed objects which might be used as instruments of assault." *Sibron v. New York*, 392 U.S. 40, 65, 88 S.Ct. 1889, 1904, 20 L.Ed.2d 917 (1968). The Minnesota Supreme Court has held that during a valid pat search for weapons, an officer may remove a "hard object of substantial size, [even though] the precise shape or nature of [the object] is not discernible through outer clothing." *State v. Bitterman*, 304 Minn. 481, 486, 232 N.W.2d 91, 94 (1975). The supreme court reasoned that because "weapons are not always of an easily discernible shape, a mockery would be made of the right to frisk if the officers were required to positively ascertain that a felt object was a weapon prior to removing it." *Id.*

Reski felt a box-shaped object. Although she did not know what it was, she

testified that she was concerned for her safety because the box could have contained a weapon. She specifically stated that "[d]ue to its size, [the box] could be used to hold any form of weapon in [it], a smaller caliber handgun, [or] a knife." Because the box could have contained a weapon, Reski was justified in removing it from Krenik's pocket. After removing the box, Reski opened it, and discovered the methamphetamine.[3] Because the *Terry* frisk of Krenik was valid, the warrantless seizure of the box was justified because the box might have contained a weapon. The pipe and methamphetamine found in Krenik's pocket established probable cause for her arrest, and Krenik does not challenge the impoundment or the inventory search of her vehicle that followed her arrest. *See State v. Camp*, 590 N.W.2d 115, 118 (Minn.1999) (probable cause to arrest exists when person of ordinary care and prudence would entertain honest and strong suspicion that a crime has been committed).

## DECISION

Ordering Krenik to get out of her lawfully stopped vehicle did not violate Article 1, section 10, of the Minnesota Constitution because it was reasonable, as defined in *Terry*, and Krenik's status as a passenger was sufficient to justify the incremental intrusion. The identity of the object that Reski felt in Krenik's pocket during the pat search was sufficiently apparent to Reski to permit a warrantless seizure of the pipe under the plain-feel exception to the warrant requirement. The district court did not err in denying Krenik's motion to suppress the evidence of drug possession found in Krenik's pocket and her vehicle.

**Affirmed.**

ROSS, Judge (dissenting)

In an unbroken chain of cases building upon *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the United States and Minnesota Supreme Courts have held that police may intrude further on a legitimately seized vehicle occupant's liberty interest when the officer has either a *particularized* concern for officer safety or, in more recent cases, when the officer is following a police practice that itself rests on *generalized* concerns for officer safety. Either way, officer safety is the linchpin. The majority relies on this same line of cases but concludes instead that police are always justified in ordering occupants from stopped cars even when the officer's action rests neither on a particularized concern for officer safety nor on a general safety concern that led to the practice of removing occupants. I agree with the majority's conclusions that Kellie Jo Krenik's continued seizure was not justified by the initial purpose of the stop and that it also was not supported by independent probable cause. I also agree with the majority that the officers' ordering of Krenik from her vehicle was justified only if this intrusion on Krenik's liberty interest was reasonable as defined in *Terry v. Ohio*. But I do not agree that police were authorized to order Krenik from her car under *Terry* and the subsequent officer-safety line of cases that the majority relies upon because officer safety was neither a direct nor indirect motivating factor in the officers' decision to prolong Krenik's detention and to order her from her car. I therefore respectfully dissent.

---

**3.** Because Krenik does not claim that Reski's opening the box was improper, we will not address that issue.

Nothing in the record indicates that the officers who ordered Krenik from her car were specifically concerned about officer safety or that their decision to remove her was based on a police practice that grew from officer-safety concerns. But the weighing of these officer-safety concerns against the occupant's liberty interest in remaining in the vehicle was the sole, controlling rationale justifying removing persons from their cars in *Pennsylvania v. Mimms*, 434 U.S. 106, 112, 98 S.Ct. 330, 333, 54 L.Ed.2d 331 (1977); *Maryland v. Wilson*, 519 U.S. 408, 413, 117 S.Ct. 882, 886, 137 L.Ed.2d 41, —— (1997); and *State v. Ortega*, 770 N.W.2d 145, 152 (Minn.2009). Each of these controlling removal-from-the-car cases involved a Fourth Amendment reasonableness inquiry, expressly weighing law enforcement's motivating safety concerns against the driver's or passenger's liberty interest. Because no specific or general officer-safety motivation exists here, these cases do not authorize the officers' actions.

In *Mimms*, the United States Supreme Court emphasized the officer's safety justification for removing the driver: "The State argues that this practice was adopted as a precautionary measure to afford a degree of protection to the officer and that it may be justified on that ground." 434 U.S. at 110, 98 S.Ct. at 333. The Court weighed the mere "incremental" infringement on the driver's liberty interest in remaining inside the stopped car specifically against the "weighty" officer-safety purpose for removing the driver: "This inquiry must ... focus ... on the incremental intrusion resulting from the request to get out of the car once the vehicle was lawfully stopped. ... We think it too plain for argument that the State's proffered justification—the safety of the officer—is both legitimate and weighty." *Id.* at 109–10, 98 S.Ct. at 332–33. Only after it had weighed those competing interests in favor of officer safety did the Court deem the officer's removal tactic to be reasonable under the Fourth Amendment. *Id.*

The Supreme Court in *Wilson* undertook that same weighing of officer-safety concerns against personal-liberty interests:

We must therefore now decide whether the rule of *Mimms* applies to passengers as well as to drivers. On the public interest side of the balance, the same weighty interest in officer safety is present regardless of whether the occupant of the stopped car is a driver or passenger....

On the personal liberty side of the balance, the case for the passengers is in one sense stronger than that for the driver.

519 U.S. at 413, 117 S.Ct. at 885–86 (footnote omitted). The *Wilson* Court then reasoned that the "danger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car," and that "the additional intrusion on the passenger [who is ordered from the car] is minimal." *Id.* at 414–15, 117 S.Ct. at 886. Based expressly on that qualitative imbalance between officer-safety interests and liberty interests related to the passengers' right to remain in the car, the Court held that "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop." *Id.* at 415, 117 S.Ct. at 886.

The Minnesota Supreme Court followed that same officer-safety-versus-liberty-interest analysis in *Ortega*, 770 N.W.2d at 152. The *Ortega* court considered whether *Wilson* applied to traffic stops in Minnesota in light of article I, section 10 of the Minnesota Constitution, which has been construed to afford greater personal-liberty protection than the Fourth Amendment.

*Id.* It reaffirmed that, under Minnesota constitutional safeguards, "[w]e balance the government's need to search or seize a vehicle's occupants against the individual's right to personal security free from arbitrary interference by law officers." *Id.* (quotation omitted). It considered the recent United States Supreme Court opinion of *Arizona v. Johnson*, —— U.S. ——, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009), a removal-from-car case that involved an officer's safety concern about "permitting a dangerous person to get behind [the officer]" during a traffic stop. *Id.* at 152 (alteration in original) (quoting *Johnson*, 129 S.Ct. at 788). The *Ortega* court followed the reasoning and adopted the holding of *Wilson*. In doing so, just like the federal cases it relied upon, its justification for allowing the officers to remove an occupant from a stopped car was that the acting officer had a legitimate concern for officer safety: "[The officer] had a valid officer-safety concern in having Ortega stand away from the passenger compartment. Thus, we conclude that it was reasonable to have Ortega exit the vehicle and stand away from the passenger compartment while it was being searched." *Id.*

It is clear to me that this case fundamentally differs from these officer-safety cases. The officers' infringement on Krenik's liberty interest was not based on the officer-safety concerns that were critical to the consistent reasoning and holdings in the removal-from-car stream of cases. Here, neither the facts nor the officers' testimony suggests that an officer-safety concern was even remotely part of the decision to order Krenik from her car. Nor did the officers imply that Krenik's removal followed a general police practice of removing passengers because of officer-safety concerns. Rather, they were motivated only by the intent to somehow assess Krenik's "mental status." The constitutionality of the intrusion here therefore cannot depend on the 40–year river of caselaw from *Terry* through *Johnson* expounding specifically on how the concern for officer safety justifies an officer's decision to stop, detain, search, or move a person. I therefore disagree with the majority's reliance on these cases.

Separate from my concern that the court's opinion today does not address the officer-safety basis essential to the *Wilson* line of cases, I also disagree with the majority's suggestion that the stop continued legitimately even after the initial justification for it ended. The majority relies on *Johnson* for the proposition that both the stop and the officers' authority to order Krenik from the car continued even beyond the lawful justification for the stop because the officers did not announce that the stop was over. But the *Johnson* Court did not provide a per se rule that a traffic stop ends only when the officers say so. The Court said only, *"Normally,* [a traffic] stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave." 129 S.Ct. at 788 (emphasis added). I think most traffic stops do end when the police declare them over, but others end when circumstances restrict police authority to prolong the stop or expand its nature. It simply cannot be that alleged over-intrusiveness by police during a stop is immune from a constitutional challenge by virtue of an officer's unilateral opportunity to declare when the stop ends; otherwise, no unreasonably detained person could *ever* challenge the constitutionality of the duration of a traffic stop.

Even if *Mimms* and *Wilson* had declared a per se Fourth Amendment rule that police may order passengers from any stopped car as a matter of course regardless of whether that practice was based on officer-safety concerns, the rule would not apply to article I, section 10 of the Minne-

sota Constitution. As our supreme court has explained, "[i]n contrast to the laxer requirements of the United States Constitution ... we have held that Article I, Section 10 of the Minnesota Constitution requires that 'the scope and duration of a traffic stop investigation must be limited to the justification for the stop.'" *State v. Burbach*, 706 N.W.2d 484, 488 (Minn.2005) (quoting *State v. Fort*, 660 N.W.2d 415, 418 (Minn.2003)); *see also State v. Flowers*, 734 N.W.2d 239, 255 (Minn.2007) (requiring new justification for additional search once "the quantum of evidence needed to justify a forcible stop has dissipated") (quotation omitted). The lawful basis for the stop here had run its full course before the officers ordered Krenik from her car because the initial purpose of the stop—Etoll's traffic violation—was resolved and the officers had no reasonable, constitutionally valid basis to prolong and expand Krenik's detention.

And I see no other basis justifying the added intrusion. When there is clear ground to do so, police certainly can inquire to ensure a driver's wellbeing. It is true that one of the officers here "wanted to make sure that it was safe for [Krenik] to drive." But this case does not mirror the line of cases that allows limited police inquiry in response to exigent circumstances to determine whether a driver needs emergency medical attention. When an officer is motivated by the objectively obvious need to render aid or assistance in a situation in which a reasonable person would believe that an emergency exists, we have recognized an exception to the warrant requirement to allow police to temporarily detain a driver to inquire into her wellbeing. *See State v. Lopez*, 698 N.W.2d 18, 23 (Minn.App.2005) (outlining cases). We have said in those circumstances that "the officer must be permitted to make contact with the individual and ensure that the individual does not require additional medical assistance." *Id.* Here, one of the officers *did* inquire into whether Krenik needed medical assistance, and Krenik expressly declared that she did not. And the issue before us is not merely the inquiry into Krenik's wellbeing, but the added intrusion of ordering her from her car, ostensibly to conduct some sort of distress evaluation. Nothing in this record supports the officers' decision to disregard Krenik's negative response. And even if it did, nothing suggests that removing her from her car was reasonable or necessary to facilitate the investigation into her distress.

In sum, the removal-from-the-car caselaw has not established a bright-line rule that police are always free to remove occupants for any reason. In this regard I disagree with the majority. The caselaw echoes the historic requirement that a court reviewing the constitutionality of police conduct must decide whether the actual police interests outweighed the liberty interests at stake. The cases consistently hold that police who are motivated by at least a general, theoretical concern for officer safety may remove the occupants from lawfully stopped cars without any particularized safety concern about those occupants. This per se rule does not excuse the state from advancing an officer-safety concern to justify a police intrusion. Rather, it clarifies that a lesser showing is needed to remove an occupant than to engage in more intrusive police action. Because even that lesser showing was not offered here, I think precedent requires us to hold that the officers violated Krenik's right not to be unreasonably seized under the Fourth Amendment and under article I, section 10 of the Minnesota Constitution by ordering her from her car.