*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1484**

State of Minnesota,
Respondent,

vs.

Bryan Anthony Case,
Appellant.

**Filed August 10, 2015
Reversed
Klaphake, Judge[*]
Dissenting, Bjorkman, Judge**

Hennepin County District Court
File No. 27-CR-12-4728

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, J. Michael Richardson, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

James P. Westphal, Minneapolis, Minnesota (for appellant)

        Considered and decided by Bjorkman, Presiding Judge; Stauber, Judge; and

Klaphake, Judge.

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**KLAPHAKE**, Judge

Appellant Bryan Anthony Case challenges the district court's denial of his pretrial suppression motion, arguing that the stop of his vehicle for equipment violations was not based on a reasonable, articulable suspicion of criminal activity, and that the officer unlawfully expanded the scope of the stop to include questioning about drug activity. While the initial stope of appellant's vehicle was lawful, the officer's conduct in questioning appellant was unreasonable and unlawfully expanded the scope of the stop beyond its initial purpose. We therefore conclude that the drugs subsequently found by the officer on appellant's person must be excluded and reverse the district court's pretrial suppression order.

## FACTS

In August 2011, a Brooklyn Park police officer was on routine patrol when he noticed a vehicle travelling in the opposite direction. According to the officer, the vehicle's exhaust was loud and it had a large, spider-webbed crack in the front windshield. The officer did a U-turn and stopped the vehicle.

The officer walked up to the vehicle and made contact with the driver, who produced his driver's license and was identified as appellant. The officer explained to appellant why he had pulled him over, and appellant indicated that he was the registered owner of the vehicle. The officer testified that he then asked the passenger, who was appellant's girlfriend, for identification. The officer continued to ask appellant other questions unrelated to the stop, including where he was going and if he had ever been

2

arrested. Appellant responded that he was going to a friend's house right around the corner and stated that he had been arrested before. The officer testified that "it was around that time that I recognized [the] vehicle as being one that I had seen on countless occasions at a particular address which was right around the corner" and was a "known and documented methamphetamine house." The officer explained that search warrants had been executed at the residence and that "there's a dispatch alert on [the] house," alerting officers to use caution when responding to any 911 calls to that location.

The officer told appellant to stay in the vehicle and began to walk back to the squad car. The officer testified that he always looks over his shoulder "for my own safety to make sure that the vehicle doesn't drive off or somebody doesn't get out of the vehicle and run while my attention is drawn somewhere else." The officer testified that he noticed appellant "reaching down towards the center console area of the vehicle." The officer described appellant's actions as "furtive," and testified that "[m]y only thought was that [appellant] was either reaching for a weapon or concealing a weapon." The officer returned to his squad car and began running routine license and warrant checks. The officer testified that when a back-up officer called and asked how he was doing, he indicated that he could use back-up based on the movements he saw appellant making. On the squad car video, the officer can be heard stating: "I'm good but I'm gonna go through the car."

During the license and warrant check, the officer learned that appellant was a predatory offender and that the address on his driver's license and his registered address were in Coon Rapids. The officer testified that he then returned to the vehicle, even

3

though his back-up had not arrived, asked appellant to step out, and conducted a pat search for weapons. The officer testified that he was concerned that appellant could have a weapon, and he did not want appellant to sit in the vehicle for very long. The officer did not find any weapons, but he did feel a small Ziploc bag containing a crystal-like substance in appellant's front right watch pocket. The officer denied manipulating the bag and testified that based on his training and experience, he immediately recognized that the bag contained methamphetamine. The bag was later tested and found to contain approximately one gram of methamphetamine.

On cross examination, the officer admitted that he never suspected appellant or his girlfriend of being under the influence of alcohol or any controlled substance, admitted that he never saw any controlled substance or alcohol in plain view, and agreed that he pulled the vehicle over solely for the equipment violations. The officer also agreed with defense counsel's observation that at some point, "you were going to investigate a possible drug case because [appellant] was going to a known meth house, and you saw him make a movement in the car," to which the officer added "[i]n addition to [appellant's] driving history with several controlled substance violations on it."

The officer further admitted on cross examination that he had pulled appellant over on at least one other occasion, and that appellant was not violent and did not have a weapon. Defense counsel indicated that appellant's license had been run by police approximately 23 times in a six-month period, which was generally confirmed by appellant and his girlfriend during their testimony. Appellant testified that he has a criminal record for a sexual offense in Arizona and several controlled substance

4

convictions, but that he has never acted violently or been arrested for disorderly conduct or assault.

Based on the baggie of methamphetamine found during the pat search, appellant was charged with fifth-degree possession of a controlled substance in violation of Minn. Stat. § 152.025, subd. 2(a)(1) (2010). Following an omnibus hearing, the district court issued an order denying appellant's motion to suppress. The court concluded that the stop of appellant's vehicle was lawful, that the officer's subjective intent did not negate the otherwise lawful stop, and that the officer had an articulable basis for searching appellant. Appellant waived his right to a jury trial, and the parties agreed to proceed under Minn. R. Crim. P. 26.01, subd. 4. The district court found appellant guilty and imposed sentence. This appeal followed.

## D E C I S I O N

When reviewing a district court's pretrial order on a motion to suppress evidence, this court reviews the district court's factual findings for clear error and its legal determinations de novo. *State v. Gauster*, 752 N.W.2d 496, 502 (Minn. 2008).

The detention of an individual during a traffic stop by police, even for a brief period and for a limited purpose, is a seizure that is entitled to constitutional protection. *See Whren v. United States*, 517 U.S. 806, 809-10, 116 S. Ct. 1769, 1772 (1996); *State v. Fort*, 660 N.W.2d 415, 418 (Minn. 2003). The Minnesota Supreme Court has held that a search or seizure during a traffic stop must be reasonable, even when a minor traffic law has been violated, and must satisfy the principles and framework of *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968). *State v. Askerooth*, 681 N.W.2d 353, 363 (Minn. 2004);

5

*see also Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) (affirming *Terry* principles apply to traffic stops).

**I.     The stop of appellant's vehicle was lawful.**

The district court found, and the record supports, that the officer stopped appellant's vehicle because it had a cracked windshield and a loud muffler. Both constitute traffic violations that on their own would support an investigatory stop. *See* Minn. Stat. §§ 169.69 ("Every motor vehicle shall at all times be equipped with a muffler in good working order which . . . is in constant operation to prevent excessive or unusual noise[.]"); .71, subd. 1(a)(1) ("A person shall not drive or operate any motor vehicle with a windshield cracked . . . to an extent to limit or obstruct proper vision[.]") (2010); *State v. Battleson*, 567 N.W.2d 69, 71 (Minn. App. 1997) (stating that "[i]f an officer observes a violation of a traffic law, however insignificant, the officer has an objective basis for stopping the vehicle"). This court has also upheld an investigatory stop where the sole reason for the stop was a noisy muffler. *State v. Pierce*, 347 N.W.2d 829, 831, 833 (Minn. App. 1984) (upholding stop of vehicle for "excessive muffler noise" and "noisy muffler"). And the Minnesota Supreme Court has upheld a stop based solely on a cracked windshield. *State v. Varnado*, 582 N.W.2d 886, 889 (Minn. 1998) (upholding initial stop because officers "had probable cause to believe [defendant] was violating a traffic regulation by driving a car with a shattered windshield"). We therefore conclude that the stop of appellant's vehicle for minor equipment violations was valid and lawful.

**II.     But once the officer unlawfully expanded the scope of the stop, any evidence thereafter seized must be suppressed.**

A traffic stop, however, must be justified not only at its inception, but "the actions of the police during the stop [must be] reasonably related to and justified by the circumstances that gave rise to the stop in the first place." *Askerooth*, 681 N.W.2d at 364 (citing *Terry*, 392 U.S. at 19-20, 88 S. Ct. at 1879) (other citations omitted). "An initially valid stop may become invalid if it becomes intolerable in its intensity or scope." *Id.* (quotations omitted). Thus, each incremental intrusion during a traffic stop must be tied to and justified by the original legitimate purpose of the stop, independent probable cause, or reasonableness. *Id.* at 365.

Appellant argues that the officer unlawfully expanded the scope of the stop by asking questions unrelated to the purpose of the stop, which eventually led the officer to conduct a pat search for weapons. Appellant claims that the officer's stated reasons for the expansion of the stop and the pat search were unrelated to the equipment violations and merely served as pretext to investigate appellant for drug activity and to conduct an illegal drug search. We agree.

An incremental intrusion during a traffic stop may be "justified by a reasonable articulable suspicion of other criminal activity." *Fort*, 660 N.W.2d at 419. The reasonable suspicion standard is not high, but the officer's suspicion must be based on specific, articulable facts, not just a hunch or a whim. *See State v. Timberlake*, 744 N.W.2d 390, 393 (Minn. 2008). Reasonableness is evaluated by looking at the totality of

7

the circumstances and must be particularized and individualized to the defendant. *State v. Burbach*, 706 N.W.2d 484, 488 (Minn. 2005).

Pretext, or "the actual or ulterior motives of an officer," does not invalidate police action that is otherwise justified. *Battleson*, 567 N.W.2d at 71. A search or arrest is lawful even if the officer "based his or her action on the wrong ground or had an improper motive," as long as there is "an objective legal basis for [the] arrest or search." *State v. Everett*, 472 N.W.2d 864, 867 (Minn. 1991). When an intrusion is not based on an objective legal basis, but on an officer's hunch or whim, the intrusion itself may not be reasonable. *See Varnado*, 582 N.W.2d at 892 (holding that frisk for weapons following stop for cracked windshield invalid when it was not based on any probable cause but was conducted because part of officer's routine procedure before placing person in back of squad car); *see also State v. Holmes*, 569 N.W.2d 181, 187-89 (Minn. 1997). Thus, the officer's subjective reasons for expanding a seizure may be relevant when the officer has no objective reason to search for weapons or narcotics, and has no basis to believe that a suspect is engaged in committing a crime for which a search is justified. *Varnado*, 582 N.W.2d at 892.

In this case, after explaining that he had stopped appellant's vehicle for having a loud muffler and acknowledging that "maybe it's not the muffler I am hearing then," the officer, as shown in the squad car video, proceeds to ask appellant a series of questions, including "whose car is it," "you still staying in Coon Rapids," "where you guys headed to now," "anything illegal in the car," "any weapons, drugs … have you been arrested before," "what have you been arrested for," "are you on probation now," and "be honest

8

with me, are there any drugs." These questions go beyond the officer's authority for the seizure, which should have been limited to the tasks tied to the traffic infraction, and demonstrate that the officer's focus quickly and unreasonably shifted to an investigation of drug activity.

Several other statements made by the officer in the squad car video suggest that the true motive for the stop was to search for drugs.[1] Appellant also testified that he had been pulled over approximately 30 times in the "six-month period before and after" the stop in this case, suggesting that he was being targeted by police. During cross examination, the officer agreed with defense counsel's statement that at some point, "you were going to investigate a possible drug case because [appellant] was going to a known meth house, and you saw him make a movement in the car," to which the officer added "[i]n addition to [appellant's] driving history with several controlled substance violations on it."

"Beyond determining whether to issue a traffic ticket [for a minor violation], an officer's mission includes ordinary inquiries incident to [the traffic] stop," including "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 135 S. Ct. at 1615 (second alteration in original) (quotations omitted). The

---

[1] Two statements made by the officer on the squad car video are particularly revealing. The first statement was made to another officer on the squad car radio before the officer ordered appellant out of his vehicle. The officer states: "I'm good but I'm gonna go through the car." Second, after arresting appellant, the officer states to appellant's girlfriend, "Well [appellant] has meth on him which is what I suspected, and I suspect you probably have some on you too."

United States Supreme Court has limited its inquiry to the length of a traffic stop and whether the stop is "prolonged beyond" the point that is lawful. *Id.* at 1616 (quotation omitted). The Minnesota Supreme Court, however, examines not only the length or duration of a stop, but also asks whether the officer has exceeded the scope of the stop beyond its initial purpose. *See Askerooth*, 681 N.W.2d at 364 (noting that "intrusion not closely related to the initial justification for the search or seizure is invalid under article I, section 10 [of the Minnesota Constitution] unless there is independent probable cause or reasonableness to justify that particular intrusion"); *see also Fort*, 660 N.W.2d at 418; *State v. Wiegand*, 645 N.W.2d 125, 135-36 (Minn. 2002).

In *Askerooth*, the supreme court concluded that the officer's confinement of a driver in the back seat of his squad car, after he was stopped for failing to obey a stop sign and the officer learned that he did not have a driver's license, was unreasonable and required suppression of drug evidence abandoned by the driver in the squad car. 681 N.W.2d at 369-70. In *Fort*, the supreme court required suppression of evidence seized from the passenger of a vehicle stopped for speeding and a cracked windshield, because the officer's search exceeded the purpose of the stop and was not based on reasonable articulable suspicion of any other crime. 660 N.W.2d at 418-19. And in *Wiegand*, the appellants' vehicle was stopped for a burned-out headlight, and while one officer was issuing a warning ticket another officer ran a drug-sniffing dog around the vehicle. 645 N.W.2d at 135-36. The supreme court concluded that because the officers lacked a reasonable articulable suspicion of drug-related criminal activity, the evidence discovered as a result of the dog sniff must be excluded. *Id.*

10

In this case, the bases for the officer's additional intrusions were unrelated to the purpose of the initial stop, were based on a hunch or a whim, and were not based on an objectively reasonable suspicion of other criminal activity. A stop for a noisy muffler does not support a search for drugs or weapons. *See United States v. Hairston*, 439 F. Supp. 515, 518 (N.D. Ill. 1977). Similarly, a search for drugs or weapons is beyond the scope of a stop for a cracked windshield. *See Varnado*, 582 N.W.2d at 889. And the expansion of the stop from these initial bases to a search for drugs was not justified based merely on appellant's association with suspected drug dealers or a known "meth-house." *See State v. Diede*, 795 N.W.2d 836, 844 (Minn. 2011). Because the officer quickly exceeded the scope of the stop well beyond its initial purpose, the drug evidence subsequently seized from appellant after that unlawful expansion must be suppressed. *See State v. Hardy*, 577 N.W.2d 212, 217 (Minn. 1998) (reiterating that "the primary purpose of the exclusionary rule is to deter police misconduct" and that by excluding evidence, "we seek to eliminate the incentive for police officers who have detained a person on a *Terry* stop to overstep the limits of the stop").

The dissent in this case emphasizes that the officer's questions, while outside the scope of the initial stop, did not lead to the discovery of drugs. The dissent focuses its analysis on the subsequent pat search and whether there was a reasonable basis to conduct that search. But police can seize an item in plain view or plain feel only if they "were lawfully in a position" from which they could view or feel the object. *In re Welfare of G.M.*, 560 N.W.2d 687, 693 (Minn. 1997). In this case, once the officer exceeded the scope of the initial stop of appellant's vehicle, he was no longer in a rightful

11

position to observe appellant's furtive movements and to require appellant to exit the vehicle in order to conduct a pat search of appellant's person.

Because the district court erred in denying appellant's motion to suppress evidence seized after the officer unlawfully expanded the scope of the stop for an equipment violation into an investigation of drug activity, we reverse.

**Reversed.**

**BJORKMAN**, Judge (dissenting)

I respectfully dissent. I agree that the stop was justified based on equipment violations. But I would conclude that the officer lawfully expanded the scope of the stop when he inquired about suspected criminal activity and conducted a protective pat search. I would therefore affirm.

During a traffic stop, an officer may reasonably ask for and check a driver's license and registration, determine whether there are outstanding warrants, and question the driver about his destination and the reason for his trip. *State v. Syhavong*, 661 N.W.2d 278, 281 (Minn. App. 2003); *see also Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015). The scope of the investigation must be limited to the reasons for the stop unless the officer develops reasonable, articulable suspicion of other illegal activity. *State v. Diede*, 795 N.W.2d 836, 845 (Minn. 2011). Reasonableness is determined by the totality of the circumstances. *State v. Smith*, 814 N.W.2d 346, 351 (Minn. 2012).

When a defendant's responses to questions and other circumstances give rise to reasonable suspicions unrelated to the traffic offense that precipitated the stop, "an officer may broaden his inquiry and satisfy those suspicions." *Syhavong*, 661 N.W.2d at 282 (quotation omitted). That is the situation here. The officer initially asked Case for his driver's license and questioned him about the cause of the loud muffler noise, who owned the vehicle, if he still lived in Coon Rapids, and where he and his passenger were going. All of these questions were within the permissible scope of the original traffic stop. *See id.* at 281 (explaining that during a traffic stop for an equipment violation an officer may

D-1

reasonably ask for a driver's license and registration and ask a driver about his destination and reason for the trip).

When asked about his destination, Case responded that he was on his way to "a friend of mines right over here." The officer recognized Case and recalled seeing his vehicle "on countless occasions" at a known meth house located "right around the corner" from where the stop occurred. The officer explained that in his experience people both heading to and leaving meth houses often possess drugs. These specific, articulable facts demonstrate that the officer's subsequent questions regarding the possible presence of drugs or weapons were not based merely on an unparticularized suspicion or hunch. *See State v. Timberlake*, 744 N.W.2d 390, 393 (Minn. 2008). Rather, the officer's expansion of the stop was the logical and permissible outgrowth of Case's responses to the initial questions and the other circumstances.

More importantly, the challenged questioning did not lead to the discovery of the drugs. The officer was entitled to and did initially ask Case to produce his driver's license. After speaking with Case and his girlfriend, the officer returned to his squad car to run a license check. As he was walking back to his squad car, the officer looked over his shoulder and observed Case making "furtive" movements, including moving towards the center console. The officer testified that he could not see what Case was reaching for, creating concern that he might be "reaching for a weapon or concealing a weapon." In the squad car video, Case can be seen shifting back and forth in the front seat as the officer looks back over his shoulder. The officer further testified that after completing the license check, he asked Case to exit his vehicle and conducted a pat search due to his

articulated concern that Case may be armed. The district court's findings of fact are consistent with the officer's testimony, demonstrating that the court found the officer's testimony regarding his observations credible. And while the majority identifies evidence that might have led another district court to treat this testimony differently, as an appellate court we may not weigh credibility or make findings of our own. *See State v. Miller*, 659 N.W.2d 275, 279 (Minn. App. 2003) (noting that the "weight and believability of witness testimony is an issue for the district court"), *review denied* (Minn. July 15, 2003).

It is well established that an officer may conduct a limited protective weapons frisk of a lawfully stopped person if the officer reasonably believes that the suspect might be armed and dangerous. *State v. Lemert*, 843 N.W.2d 227, 230 (Minn. 2014). The furtive movements that the officer observed provided a reasonable basis for conducting such a protective pat search. *See State v. Flowers*, 734 N.W.2d 239, 252 (Minn. 2007) (concluding "suspicious movements" in vehicle gave officers reasonable suspicion defendant might have been armed and dangerous); *State v. Dickerson*, 481 N.W.2d 840, 843 (Minn. 1992) (stating that evasive conduct may give rise to reasonable suspicion). Accordingly, I would conclude that the officer lawfully expanded the scope of the traffic stop when he conducted a pat search because there was a reasonable, articulable basis to suspect Case was armed and posed a threat to the officer. Because this expansion was objectively reasonable, whether the officer had an ulterior motive, as the majority suggests, is not relevant. *See State v. Koppi*, 798 N.W.2d 358, 363 (Minn. 2011) (stating that "[t]he actual, subjective beliefs of the officer are not the focus in evaluating

D-3

reasonableness"); *State v. Battleson*, 567 N.W.2d 69, 71 (Minn. App. 1997) (noting an improper ulterior motive does not invalidate police action supported by an objective legal basis).

Having determined that the pat search was lawful, I would likewise conclude that the seizure of drugs from Case's pocket was valid under the plain-feel exception to the warrant requirement. Under that exception, "[i]f a police officer lawfully pats down a suspect's outer clothing and [an object's] identity [is] immediately apparent [and] the object is contraband, its warrantless seizure would be justified." *Minnesota v. Dickerson*, 508 U.S. 366, 376-77, 113 S. Ct. 2130, 2137 (1993); *see also State v. Krenik*, 774 N.W.2d 178, 185 (Minn. App. 2009) (recognizing the plain-feel exception to the warrant requirement), *review denied* (Minn. Jan. 27, 2010).

The officer testified that when he frisked Case's watch pocket he felt a small Ziploc "gram bag" containing a crystal-like substance that was consistent with methamphetamine. Based on his experience conducting "50 or so narcotics arrests for methamphetamine" the officer immediately recognized the significance of the bag and the nature of its contents. The officer further stated that based on his training and experience "[t]his bag was so obvious to me in that pocket, I didn't have to manipulate it because I knew exactly what it was once I touched it." The district court accepted this testimony, which demonstrated that the incriminating nature of the drugs was "immediately apparent" to the officer. On this record, I would conclude that the seizure of drugs from Case's pocket was within the permissible scope of the protective pat search and the evidence should not be suppressed.